**STATE OF MINNESOTA, By its Attorney General, Warren SPANNAUS, and its Pollution Control Agency, Plaintiff,**

v.

**Howard H. CALLAWAY, Secretary Department of the Army, et al., Defendants.**

No. 3–75–Civ–120.

United States District Court,
D. Minnesota,
Third Division.

Oct. 9, 1975.

Warren Spannaus, Atty. Gen., Eldon G. Kaul, Asst. Atty. Gen., and William P. Donohue, Sp. Atty. Gen., St. Paul, Minn., for plaintiff.

Robert G. Renner, U. S. Atty., Stephen G. Palmer, Asst. U. S. Atty., Minneapolis, Minn., and Michael O. Graves, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM & ORDER

DEVITT, Chief Judge.

In this declaratory judgment action brought by the State of Minnesota against certain federal officials, the issue is whether the U. S. Corps of Engineers must comply with Minnesota laws and regulations governing pollution abatement in its dredging operations on the Mississippi River and elsewhere. We hold it must.

The matter is before the court on defendants' motion to dismiss under Rule 12 based on their allegations that the court lacks subject matter jurisdiction and the complaint fails to state a claim upon which relief can be granted. Because there are no issues of material fact, this matter is considered submitted on cross motions for summary judgment.[1]

In this lawsuit, plaintiff, the State of Minnesota by its attorney general and its Pollution Control Agency, seeks a declaration that the Water Pollution Control Act Amendments of 1972, 33 U. S.C.A. § 1251 *et seq.*, require defendants, the Secretary of the Army, the Corps of Engineers and two of its officers, to carry out their dredging activities in compliance with Minnesota pollution abatement laws and regulations. In its three count complaint, plaintiff contends that defendants are in violation of Minnesota pollution laws and regulations which require secondary treatment of all dredged spoil, forbid discharges into navigable waters which

violate state water quality standards and require all dredgers obtain a disposal permit from the Pollution Control Agency. Plaintiff alleges that the dredging activities of defendants seriously harm the quality of navigable waters within Minnesota by resuspending and redissolving previously adsorbed or dormant pollutants causing turbidity and degrading the habitat of fish, plants and other water organisms.

### Jurisdiction

The first question presented for decision is whether the general federal question statute, 28 U.S.C.A. § 1331, gives the court jurisdiction to enforce the Water Pollution Control Act. Defendants· argue that 33 U.S.C.A. § 1365, which provides that "[t]he district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce . . . an effluent standard or limitation . . . and to apply any appropriate civil penalties under section 1319(d) of this title," is the exclusive jurisdictional basis to raise questions under the Act. Section 1365(b) provides that "[n]o action may be commenced—under . . . this section—

(A) prior to sixty days after the plaintiff has given notice of the alleged violation . . . (iii) to any alleged violator. . . ."

Because plaintiff has not complied with this notice provision, defendants argue that this suit must be dismissed for want of subject matter jurisdiction. For the reasons that follow, the court accepts plaintiff's contention that it has jurisdiction under the general federal question statute to hear claims arising under the Water Pollution Control Act.[2]

---

1. At oral argument held on August 18, 1975, the parties agreed that there are no issues of material fact, that the case is indeed ripe for final determination and that it should be considered as if submitted on cross motions for summary judgment.

2. Plaintiff also maintains that section 10(a) of the Administrative Procedure Act, 5 U.S. C.A. § 702, provides jurisdiction. The case law in this circuit is that the Administrative Procedure Act does not furnish an independent basis of jurisdiction. *Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe,* 370 F.2d 529 (8th Cir. 1967).

First, § 1365(e) states that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)." This "saving clause," consistent with the legislative history of § 1365, evinces a clear congressional intent to expand, rather than restrict federal jurisdiction.

Defendants direct the court's attention to *Natural Resources Defense Council, Inc. v. Callaway*, 389 F.Supp. 1263 (D.Conn.1974), where the court decided that "alleged violations of the Water Pollution Control Act may not be complained of under some other jurisdictional head (*e. g.,* 28 U.S.C. § 1331 (1970))" despite subsection (e). *Id.* at 1271, n. 28. This subsection, the court decided, "was not intended to allow violations of the Act to be prosecuted, except as they create some rights independent of the Act, other than under the jurisdictional grant of the Act, 33 U.S.C. § 1365 (Supp. II, 1972)." *Id.* However, the Court of Appeals for the District of Columbia Circuit, in an enlightening and well reasoned opinion, concluded that actions to enforce the Act may be brought under § 1331.[3] *Natural resources Defense Council, Inc. v. Train*, 166 U.S. App.D.C. 312, 510 F.2d 692, 699 (1975).

In that case, plaintiff did not give the sixty days notice required by § 1365 and defendant urged the court to dismiss for lack of subject matter jurisdiction arguing that any lawsuit to enforce the Act must be commenced under § 1365. In reaching its decision, the court relied on the legislative history of § 1365 and also on the legislative history of section 304 of the Clean Air Act Amendments of 1970. Congress used this provision of the Clean Air Act as the model for §

1365. 1972 U.S.Code Cong. & Admin. News p. 3745. The legislative history of section 304 clearly indicates that it was intended to broaden rather than restrict federal jurisdiction. That section "took broad steps to facilitate the citizen's role in the enforcement of the Act, both in renouncing those concepts that make federal jurisdiction dependent on diversity of citizenship and jurisdictional amount, and in removing the barrier, or hinderance, to citizen suits that might be threatened by challenges to plaintiff's standing." *Natural Resources Defense Council, Inc. v. Train, supra,* at 700. The court determined that, in light of its legislative history, section 304 "reflected a deliberate choice by Congress to widen citizen access to the courts . . .." *Id.* A congressional report on this section stated that "[t]he right of persons (or class of persons) to seek enforcement or other relief under any statute or common law is not affected." *Id.* at 701, n. 45. The sixty days notice provision is one of several jurisdictional restrictions contained in § 1365. However, these "restrict the expansion of jurisdiction provided by the special citizen suits provision of § 1365 and do not cut back on federal court jurisdiction over actions that would have been maintainable even in the absence of that special authorization. This intent is confirmed by the saving clause of subsection (e)." *Id.* at 702, footnote omitted.

Clearly, an action for a declaration that the Act applies to these defendants is one arising under the laws of the United States. However, to properly invoke the jurisdiction granted by § 1331, not only must the action arise under the laws of the United States but there must be more than $10,000 in controversy. The Supreme Court has recently indicated that this jurisdictional amount may be assumed in cases such as this. *Illinois v. City of Milwaukee*, 406

---

3. The Court of Appeals also decided that section 10(a) of the Administrative Procedure Act, 5 U.S.C.A. § 702, would furnish jurisdiction. However, the law in that circuit is that section 10(a) is an independent source of jurisdiction. *Pickus v. Board of Parole*, 165 U.S.App.D.C. 284, 507 F.2d 1107 (1974).

U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). The Court stated that "[t]he considerable interests involved in the purity of interstate waters would seem to put beyond question the jurisdictional amount provided in § 1331(a)." *Id.* at 98, 92 S.Ct. at 1390. Because this is an *action arising* under the laws of the United States and there is more than $10,000 in controversy, the court has jurisdiction under 28 U.S.C.A. § 1331.[4]

### Sovereign Immunity

 Defendants also contend in this preanswer motion that this suit, filed against a federal agency and three federal officials, is actually against the sovereign and therefore barred by the doctrine of sovereign immunity. A suit is against the sovereign if the "effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963), citing *Larson v. Domestic & Foreign Commerce Corporation,* 337 U. S. 682, 704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Because it is without question that the effect of a judgment in favor of Minnesota would be to compel defendants to comply with state pollution abatement requirements, this is a lawsuit *against the sovereign.*

It is an elementary principle of law that a suit against federal officials is not barred by the doctrine of sovereign immunity if those officials are acting beyond their statutory powers. The Court in *Larson, supra,* said:

Where the officer's powers are limited by statute, his actions beyond

those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be the object of specific relief.

*Larson, supra,* at 689, 69 S.Ct. at 1461.

In its complaint, plaintiff has alleged that §§ 1311 and 1323 are statutory constraints on defendants' powers which require them to comply with Minnesota pollution abatement requirements. Therefore, if plaintiff's allegations are true, defendants are acting *ultra vires* their authority and may not rely on sovereign immunity.

 In addition, it is clear from the language of this Act and its legislative history that Congress intended to waive sovereign immunity as to any action brought to enforce the terms of the Act. The report of the Senate Committee on Public Works on § 1323 indicates that federal facilities must "meet all control requirements as if they were private citizens." 1972 U.S.Code Cong. & Admin. News p. 3734. Section 1365, discussed above, allows any person adversely affected by the polluter to bring an enforcement action in the district courts. The committee report on this section states that:

[An] enforcement action might be brought against an individual or government agency. As recognized under section 313 of the bill [§ 1323], Federal facilities generate considerable water pollution. Since some Federal

---

4. Section 1365 was intended to encourage "citizen participation in the enforcement" of this Act. 1972 U.S.Code Cong. & Admin. News p. 3745. The sixty day notice provision was intended to afford the alleged polluter an opportunity to comply with the terms of the Act and thus avoid the necessity of a lawsuit. Plaintiff has engaged in protracted negotiations with defendants seeking to settle this controversy. All through those negotiations and through this lawsuit, defendants have maintained that

they do not have to comply with Minnesota's pollution abatement requirements. Thus, in this case, the purpose behind the sixty-day notice provision would not be served by dismissing this lawsuit. In addition, judicial economy would certainly not be promoted. Plaintiff's counsel has stated that if this lawsuit were dismissed on jurisdictional grounds, the State would merely give notice, wait sixty days and refile the same complaint.

agencies such as the Department of Defense have failed in abating pollution and in requesting appropriations to develop control measures, it is important to provide that citizens can seek, through the courts, to expedite the government performance specifically directed under section 313 [§ 1323].

1972 U.S.Code Cong. & Admin.News. p. 3746.

■ These sections of the Act and the pertinent legislative history clearly indicate that Congress intended federal agencies and federal officers to have the same obligations under this Act as any other person would have. The inevitable consequence of this intention is that sovereign immunity does not bar a suit against federal officials or agencies to enforce the terms of the Act.

### Federal Compliance

We come to the principal question at issue—whether federal agencies must obtain state discharge permits.

The objective of this legislation is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.A. § 1251. In order to reach this objective, Congress established as one of its goals the elimination by the year 1985 of the discharge of pollutants into navigable waters. Further, Congress recognized that it is the primary responsibility and right of the states "to prevent, reduce, and eliminate pollution," and it committed the federal government to provide "technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution." *Id.*

■ In order to accomplish this awesome objective, Congress directs the Administrator of the Environmental Protection Agency to establish, and regularly revise, limitations on the quantity of pollutants which may be discharged into navigable waters. These effluent limitations are to be enforced through permit systems, the most important of which are the permit systems established pursuant to § 1342. That section authorizes states to establish and administer permit programs and directs the Administrator of the E.P.A. to approve these state programs if they meet prescribed standards. If a state does not have a permit program or if a state's approved program does not regulate a specific type of discharge, the Administrator may issue a permit for the discharge if the discharge meets the established effluent limitations. The language of the Act and its legislative history make it clear, however, that these state permit programs are to be the primary enforcement mechanism under the Act.

. . . The Federal Government as the custodian of the navigable waters has the responsibility to control affirmatively any discharges of pollutants into the navigable waters and, under the Committee bill, seek to achieve elimination of the discharge of pollutants.

It is expected that the States will play a major role in the administration of this program.

The Committee believes that, after a transition period during which the State program and capability will be upgraded, the program should be administered by those States with programs which meet the requirements of this Act.

Therefore, the bill provides that after a State submits a program which meets the criteria established by the Administrator pursuant to regulations, the Administrator shall suspend his activity in such State under the Federal permit program.

1972 U.S.Code Cong. & Admin.News, p. 3737.

■ With this background in mind, a reading of § 1323 and its legislative history clearly indicates that, as a general rule, federal agencies are subject to

state permit requirements. That section directs that:

> [e]ach department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government . . . engaged in any activity resulting, or which may result, in the discharge . . . of pollutants shall comply with . . . State, . . . and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements, including the payment of reasonable service charges.

The Court of Appeals for the Ninth Circuit, when confronted with this question, relied on the last clause quoted above, in deciding that federal facilities have to obtain state permits. *California v. Environmental Protection Agency*, 511 F.2d 963 (9th Cir.), cert. granted 422 U.S. 1041, 95 S.Ct. 2655, 45 L.Ed.2d 693 (1975). That case interpreted "reasonable service charges" as including charges incident to state permit programs. *Id.* at 970. However, the answer to this question seems to come more directly from a reading of the whole Act. Congress, recognizing that federal agencies are among the major polluters of this nation's waterways, *see, e. g.* Committee Report on § 1365, 1972 U.S.Code Cong. & Admin.News, p. 3746, directed those agencies to comply with state "requirements respecting control and abatement of pollution. . . ." 33 U.S.C.A. § 1323. This is an unqualified order to comply. The Act draws no distinction between substantive compliance and procedural compliance. Further, to exempt federal agencies from state permit requirements, the primary enforcement mechanism established by the Act, could allow those agencies to exceed the applicable effluent limitations promulgated pursuant to the Act.

▮▮▮ Defendants contend that even if federal agencies must, as a general rule, obtain state discharge permits, § 1344 exempts dredging operations

from all state regulatory programs authorized by § 1342(b). In order to answer this final question, it is necessary to closely examine the relation among §§ 1342(a), 1342(b) and 1344.

The first sentence of § 1342(a) indicates that there are basically three types of federal enforcement programs which operate in the absence of an approved state program. First, the Administrator may "permit the discharge of a specific pollutant or pollutants under controlled conditions associated with an approved aquaculture project under Federal or State supervision." 33 U.S.C.A. § 1328(a). Second, the Administrator and the Secretary of the Army may provide for and regulate the discharge of dredged or fill material into navigable waters. 33 U.S.C.A. § 1344. Finally, § 1342(a) regulates all other discharges. However, § 1342(b) authorizes the governor of each state to establish a permit program to regulate "discharges into navigable waters within its jurisdiction. . . ." Section 1362(16) defines "discharge" as "a discharge of a pollutant" or "a discharge of pollutants," and § 1362(6) defines "pollutant" as including "dredged spoil." Thus, clearly § 1342(b) authorizes the establishment of state permit programs which regulate, among other things, the discharge of dredged material into navigable waters. The Conference Committee report on § 1344 stated, although in a different context, that "[c]onsistent with the intent of this Act, the conferees expect that the disposal activities of private dredgers and the Corps of Engineers will be treated similarly." 1972 U.S.Code Cong. & Admin.News p. 3819.

Defendants urge that because § 1344 specifically deals with the disposal of dredged spoil, it alone must be referred to in answering this question. However, this Act offers a comprehensive, albeit a complex, regulatory scheme to restore this nation's water resources. This legislation and its history indicate that restoration is to be accomplished by ef-

fluent limitations promulgated by the Administrator but enforced by the states aided by federal funding and technical assistance. In isolation § 1344 might appear to be the only provision applicable to dredging. However, taken in context, it is clear that § 1344 is applicable only if there is no approved state permit program or if the approved state program does not attempt to regulate dredging. 33 U.S.C.A. § 1342(c). However, because Minnesota has an approved state program, a program which covers the dredging operations in question, 39 Fed.Reg. 26061, § 1344 does not come into play.

 Finally, defendants argue that to compel them to obey state requirements would impair their authority to maintain navigation in violation of the protection afforded by § 1371. That section provides that:

> [t]his chapter shall not be construed as . . . affecting or impairing the authority of the Secretary of the Army (A) to maintain navigation. . . .

Compelling defendants to comply with state permit requirements would not affect the Secretary's authority to maintain navigation. It would merely require the Secretary and the Corps of Engineers to accomplish this mission in compliance with effluent limitations established pursuant to the Act.

In summary, the language and legislative history of the Water Pollution Control Act clearly indicates that the objectives of the Act are to be met primarily by the states thru adequate pollution control programs vigorously enforced. Section 1342(b) authorizes states to establish permit programs to regulate discharges of all pollutants. Minnesota's plan, which has the approval of the Administrator, regulates the discharge of dredged spoil into navigable waters.

Accordingly, the court declares that § 1342(b) grants to Minnesota authority to require defendants to comply with state pollution abatement requirements including obtaining a state discharge permit.

It is ordered that plaintiff's motion for summary judgment is granted and defendants' motion for summary judgment is denied.