STATE OF MINNESOTA, by its Attorney General, Warren SPANNAUS, and its Pollution Control Agency, Appellee,

v.

Martin R. HOFFMAN, as Secretary of the Army, et al., Appellants.

No. 75–1869.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1976.

Decided Oct. 28, 1976.

Larry Boggs, U. S. Dept. of Justice, Land & Natural Resources Div., Appellate Section, Washington, D. C., for appellants; Peter R. Taft, Asst. Atty. Gen., Edmund B. Clark, Michael D. Graves, Attys., U. S. Dept. of Justice, Land & Natural Resources Div., Washington, D. C., Robert G. Renner, U. S. Atty., and Stephen G. Palmer, Asst. U. S. Atty., Minneapolis, Minn., on the briefs.

William P. Donohue, Asst. Atty. Gen., Roseville, Minn., for appellee; Warren R. Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., St. Paul, Minn., and Eldon G. Kaul, Asst. Atty. Gen., Roseville, Minn., on the briefs.

Khristine L. Hall and J. G. Speth, Natural Resources Defense Council, Washington,

D. C., filed brief for amici curiae, Natural Resources Defense Council.

Evelle J. Younger, Atty. Gen., Carl Boronkay, Asst. Atty. Gen., Los Angeles, Cal., Roderick Walston and Richard C. Jacobs, Deputy Attys. Gen., San Francisco, Cal., filed amicus curiae brief, State of Cal.

Before BRIGHT and WEBSTER, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

■ The case before us is one of first impression and involves the dredging operations of the Army Corps of Engineers. The various procedural arguments made below have not been pursued on appeal. The issue, the parties are agreed, is the authority of the State of Minnesota under the Federal Water Pollution Control Act Amendments of 1972 (hereafter "the Amendments"), 86 Stat. 816, 33 U.S.C. § 1251 *et seq.* (Supp. IV), to regulate the Corps of Engineers of the United States Army, in the Corps' conduct of dredging operations in the navigable waters[1] of the United States, within Minnesota. The District Court, writing before the recent interpretation of the 1972 Amendments by the Supreme Court in *EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), held that § 402(b) of the Amendments, 33 U.S.C. § 1342(b) (Supp. IV), establishing the National Pollutant Discharge

Elimination System (hereafter "NPDES"), "grants to Minnesota authority to require defendants to comply with state pollution abatement requirements including obtaining a state discharge permit." *Minnesota, Spannaus v. Callaway,* 401 F.Supp. 524, 531 (D.Minn.1975). We reverse and remand for the entry of judgment in accordance herewith.

The original Federal Water Pollution Control Act was passed in 1948,[2] frequently revised, and codified at 33 U.S.C. § 1151 *et seq.* It proved to be inadequate.[3] The result was the enactment of the Amendments of 1972, their objective being "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[4]

Although the Amendments retained the basic policy placing primary responsibility for the control of water pollution in the states,[5] two major changes were made. The first imposes direct restrictions on discharges of pollutants, phrased in terms of "effluent limitations" on "point sources," thus making it unnecessary, as had been the case theretofore, to work backwards from a polluted body of water to determine the point source of the pollution.[6] The second major change was the establishment of the National Pollutant Discharge Elimination System (NPDES)[7] for the purpose of attaining and enforcing the effluent limitations.

The Bill of Complaint alleged that the Corps of Engineers, for the purpose of aid-

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, Southern Division, sitting by designation.

1. The term, "navigable waters," as here used means "the waters of the United States, including the territorial seas." Amendments § 502(7), 33 U.S.C. § 1362(7) (Supp. IV). That the Congress intended to extend the Act's jurisdiction to the constitutional limit is clear from the Conference Committee report, S.Rep.No. 92–1236, 92d Cong., 2d Sess. 144 (1972), U.S. Code Cong. & Admin.News 1972, p. 3776 in 1 Legislative History of the Water Pollution Control Act Amendments of 1972 (compiled for the Senate Comm. on Public Works by the Library of Congress), Ser. No. 93–1 at 327 (1973) (hereafter "Leg.Hist.").

2. Act of June 30, 1948, 62 Stat. 1155.

3. *See State Water Resources Control Board, supra,* at 200, 96 S.Ct. at 2022, 48 L.Ed.2d 578.

4. § 101(a)(1), 33 U.S.C. § 1251(a)(1) (Supp. IV).

5. *See* § 101(b), 33 U.S.C. § 1251(b) (Supp. IV).

6. *See* § 311(b), 33 U.S.C. § 1311(b) (Supp. IV). The terms "effluent limitation" and "point source" are defined in § 502(11), 33 U.S.C. § 1362(11) (Supp. IV), and § 502(14), 33 U.S.C. § 1362(14) (Supp. IV), respectively.

7. § 402, 33 U.S.C. § 1342 (Supp. IV).

ing commercial navigation, maintains a navigation channel in the Mississippi River, various harbors on Lake Superior, and a harbor on Lake of the Woods by its dredging operations. These dredging operations are alleged to have caused deterioration in water quality.[8] Both federal law and state law were relied upon and violations of both were alleged. The relief requested was a declaratory judgment that the "applicable federal law requires the dredging activity of the defendants to be carried out within the ambit of state laws and regulations," and that the dredging activities of the defendants within the State of Minnesota "be conducted in accordance with the Minnesota Statutes and Regulations regarding water quality."

The Corps moved to dismiss under Fed.R. Civ.P. 12(b), arguing that the District Court lacked subject matter jurisdiction and that the complaint failed to state a claim for which relief could be granted. Oral argument on the motion was held, and, as the parties agreed that no question of material fact existed, the District Court considered the matter submitted on cross-motions for summary judgment, granted the state's motion, and denied that of the Corps.

First, the District Court's conclusion that the Corps is required to obtain discharge permits from the State of Minnesota cannot be maintained, in light of *State Water Resources Control Board, supra.* In,

*State Water Resources Control Board,* the Supreme Court held that agencies of the federal government do not need to obtain NPDES discharge permits from the states.[9]

We turn now to the major question posed by this case. In support of its argument that the Corps is required to conform to the State's water quality standards and effluent limitations, Minnesota relies primarily upon two sections of the Amendments, § 313, 33 U.S.C. § 1323 (Supp. IV), and § 510, 33 U.S.C. § 1370 (Supp. IV). The former, § 313, requires that:

Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants shall comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements, including the payment of reasonable service charges. * * *

This provision of the Amendments, it is argued, "clearly and explicitly requires Federal entities to comply with State requirements respecting the control and abatement of pollution." In addition, in support of its position, the State urges to us the requirements of § 510, 33 U.S.C. § 1370 (Supp. IV), providing, in part, that:

8. The Corps points out that it is under a duty to maintain a nine foot channel in the Mississippi River, 47 Stat. 55, and a twenty-eight foot channel for the Duluth-Superior Harbor, River and Harbor Act of 1960 § 101, 74 Stat. 480, 482.

9. There are actually two Minnesota permit programs involved in this case. The first, established under Minn.Stat. § 115.03 subds. 1(e) & 5 (1974), is the Minnesota NPDES program, which § 402(b) of the Amendments, 33 U.S.C. § 1342(b) (Supp. IV), authorizes. Minnesota's NPDES program has been approved by EPA, *see* 39 Fed.Reg. 2606 (July 16, 1974). The second, the Minnesota Disposal System, Minn. Stat. § 115.07, is an independent state permit program, not authorized by federal law, and not submitted to EPA for approval. As a matter of practice, Minnesota issues one permit to water polluters, designated as both a Minneso-

ta Disposal System permit and a Minnesota NPDES permit.

While compliance by federal agencies with independent state permit programs was not directly at issue in *State Water Resources Control Board, supra,* the rationale for that decision leads, *a fortiori,* to the conclusion that the Corps need not obtain such permits. The Court's rationale in *State Water Resources Control Board* was that there had not been a clear and unequivocal waiver, by Congress, of federal immunity from state regulation with respect to state administered NPDES permit programs. Unlike state NPDES permit programs, the Minnesota Disposal system is not authorized by Congress, hence the case for finding a waiver of federal immunity is much weaker with respect to it than with respect to state NPDES programs.

Except as expressly provided in this Act, nothing in this Act shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; * * *.

The Corps, per contra, raises a basic constitutional issue, asserting that the Supremacy Clause of the United States Constitution (Art. VI, Cl. 2), absent Congressional authorization, bars state regulation of its dredging operations, which are performed in the navigable waters of the United States to maintain navigation, and that Congress has nowhere in the 1972 Amendments authorized such state regulation. Per contra, it urges that § 404 of the Amendments, 33 U.S.C. § 1344 (Supp. IV), creates an exclusive program for dredged or fill material, including dredged spoil. Under this section, it is argued, the sole and exclusive responsibility for the administration of the program is vested in the Secretary of the Army, acting through the Chief of Engineers, and no provision is found therein for administration by the EPA or by any state. Section 404 provides as follows:

### PERMITS FOR DREDGED OR FILL MATERIAL

SEC. 404. (a) The Secretary of the Army, acting through the Chief of Engineers, may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

(b) Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary of the Army (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary of the Army, which guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 403(c), and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

(c) The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary of the Army. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

With respect to the above-quoted section, the Corps points out that § 402, 33 U.S.C. § 1342 (Supp. IV), the section creating the NPDES, commences with an exception, manifesting a Congressional intent that the EPA not exercise administrative authority over the pollutant covered by § 404, namely,

(a)(1) *Except as provided in sections 318 and 404 of this Act,* the Administrator [10] may * * * issue a permit for the discharge of any pollutant * * *. (Emphasis and added footnote ours.) [11]

At the heart of the controversy, then, is the basic question of the existence and ex-

---

10. The Administrator here referred to is the Administrator of the EPA. § 101(d); 33 U.S.C. § 1251(d) (Supp. IV).

11. Note that the exception in § 402, "except as provided in section[ ] * * * 404," provides another basis, independent of the Supreme Court decision in *State Water Resources Control Board, supra,* for holding that the Corps

tent, if any, of the authority of the state, purportedly embodied principally in § 313, 33 U.S.C. § 1323 (Supp. IV), and § 510, 33 U.S.C. § 1370 (Supp. IV), over the Corps of Engineers as to the Corps' dredging for the purpose of aiding commercial navigation, in the light of the heretofore cited provisions relied upon by the Corps, principally §§ 402, 33 U.S.C. § 1342 (Supp. IV) and 404, 33 U.S.C. § 1344 (Supp. IV).

The legislative history of the 1972 Amendments is extensive[12] and we have reviewed it in detail. The Senate version of the Amendments, S.2770,[13] as reported out of the Senate Committee on Public Works, did not contain a special provision on dredging. The only special provision in the bill on dredging was § 401(c):

> In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.[14]

As reported out of the Senate Committee on Public Works, § 402 of S.2770 would have included the disposal of dredged spoil in the NPDES, requiring that a permit be obtained from the EPA Administrator. During the Senate floor debate on S.2770, Senator Ellender, of Louisiana, introduced the following amendment:

> At page 161, between lines 7 and 8 add new section:
> Sec. 404. (a) The Secretary of the Army may issue permits, after notice and opportunity for public hearing, for the

discharge of dredged materials into navigable waters at specified disposal sites.[15]

> (b) In identifying disposal sites for the purposes of subsection (a), the Secretary shall apply the criteria established pursuant to subsection (c)(1) of section 403 together with an evaluation of the impact of such sites. on navigation and anchorage. In applying such criteria, the Secretary in cooperation with the Administrator, shall determine those sites which would not adversely affect shellfish beds, fisheries (including spawning and breeding areas) or recreation areas. (Footnote ours.)

2 Leg.Hist. at 1386. In explanation of his amendment Senator Ellender said:

> It simply retains the authority of the Secretary of the Army to issue permits for the disposal of dredged materials. This is essential since the Secretary of the Army is responsible for maintaining and improving the navigable waters of the United States.

*Id.*

In explaining subsection (b) of his amendment, Senator Ellender amplified his concern with the maintenance of navigation:

> * * * The Secretary of the Army will not be obligated to require strict compliance with the effluent requirements established by the Environmental Protection Agency in issuing permits. The strict adherence to the published standards would result in 90 percent of the ports and harbors of the United States being closed, until such time as land disposal areas are provided. This would create a catastrophical situation with respect to our foreign and domestic commerce.

*Id.* at 1387.

Senator Muskie spoke in opposition to the Ellender amendment, arguing, in part:

---

does not have to obtain a Minnesota NDPES permit. *See* note 31 *infra.*

**12.** The legislative history of the 1972 Amendments has been compiled for the Senate Committee on Public Works, by the Library of Congress, in two volumes containing 1,766 pages.

**13.** 92d Cong., 1st Sess., 2 Leg.Hist. 1534 (1971).

**14.** S.2770 at 151–52, 2 Leg.Hist. at 1684–85. Section 401(c) of S.2770 became § 401(c) of the Amendments, 33 U.S.C. § 1341(c) (Supp. IV), without amendment.

**15.** We note the similarity between the language of the amendment proposed as § 404(a) and that ultimately enacted.

What Senator Ellender's amendment would do would be to exempt dredging. There is no question that the Secretary of the Army should retain authority to permit dredging operations for the purpose of navigable water and channel maintenance. It is a mission-oriented agency, and this is its mission. We do not undertake to turn that mission over to anybody else, and that specific activity should not be interfered with by the Environmental Protection Agency.

But, conversely, spoil disposal should be subject to EPA regulations. Spoil disposal is a pollutant. Any person who wished to dump polluted dredge spoil into navigable waters would be required, under this section, to get a permit from EPA or the State, just as would be required of other discharges.

*Id.* at 1388.

The House version of the Amendments, H.R. 11896,[16] differed from the Senate version as to the disposal of dredged material into the navigable waters. Section 404(a) thereof provided, as does § 404 of the Amendments, 33 U.S.C. § 1344 (Supp. IV), for the Secretary of the Army to issue the specified permits, upon his determination that "such discharge [would] not unreasonably degrade or endanger human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities." In making this determination, the Secretary was to apply, *inter alia,* guidelines promulgated by the Administrator, but in the event of conflict, the Secretary was to have had the final decision-making authority.[17]

The report of the House Committee on Public Works stated:

The Committee expects that until such time as economic and feasible alternative methods for disposal of dredge material are available, *no arbitrary o[r] unreasonable restrictions shall be imposed on dredging activities essential for the maintenance of interstate and foreign commerce,* and that, consistent with the intent of this Act, the Committee expects the disposal activities of private dredgers and the Corps of Engineers will be treated in a similar manner. (Emphasis ours.)[18]

Minnesota argues that the second portion of the quoted paragraph, regarding similar treatment of private dredgers and the Corps, supports its position. It says, in substance, that since private dredging is subject to state regulation, "the Corps activities can only be similarly treated if they are also subject to State regulation."[19] However, as may be observed, the House Committee expressed only an intent that private dredgers and the Corps be given similar but not identical, treatment.[20] In any event, identical treatment of Corps dredging and private dredging is not possible. Private dredgers, like all other "applicants" for federal permits, must obtain water quality compliance certificates from the states in order to obtain federal permits. § 401(a), 33 U.S.C. § 1341(a) (Supp.

---

**16.** 92d Cong., 2d Sess., 1 Leg.Hist. 893 (1972).

**17.** H.R. 11896 § 404(b), 1 Leg.Hist. at 1063–64. The Secretary of the Army would have been allowed to disregard the Administrator's guidelines and recommendations when he determined that there was "no economically feasible alternative reasonably available."

**18.** H.R.Rep.No.92–911, 92d Cong., 2d Sess. at 130, 1 Leg.Hist. at 817.

**19.** Brief for Minnesota at 22.

**20.** As enforced by Department of the Army regulations, § 404 does provide for similar treatment of the disposal activities of private persons and those of the Corps. The guidelines promulgated by the EPA Administrator, in conjunction with the Secretary of the Army, under § 404(b), have been recognized by the Army to be applicable to the Corps' dredging activities. *See* 33 C.F.R. § 209.145(a) (1975). Furthermore, the Army recognizes that the limited veto power over the specification of disposal sites given to the Administrator in § 404(c) applies to the Corps' own projects. *See* 33 C.F.R. § 209.145(b)(1) (1975). Additionally, the Corps has devised a procedure functionally equivalent to permit issuance for its own dredging projects. *See* 33 C.F.R. § 209.145(f)(1)(vii) (1975).

IV).[21] Federal agencies are not "applicants," § 401(a)(6), 33 U.S.C. § 1341(a)(6) (Supp. IV), and thus they need not obtain state certificates of water quality compliance.

The sentence relied upon by Minnesota, is, however, construed out of context. The language concerning similar treatment for Corps dredging and private dredging occurs immediately after the Committee expresses its concern that unreasonable restrictions not be placed "on dredging activities essential for the maintenance of interstate and foreign commerce." It is the dredging activities of the Corps which are essential for the maintenance of commerce.

In the Conference Committee a compromise was reached on the treatment of dredged spoil as a pollutant. The Conferees adopted a version substantially similar to the House version, the major difference being that the Conference version gives the EPA Administrator a veto power over the Secretary of the Army in the issuance of permits.[22]

21. *See also* 33 C.F.R. § 209.120(f)(3) (1975); 40 C.F.R. Part 230, 40 Fed.Reg. 11292–93 (Sept. 5, 1975).

22. § 404(c), 33 U.S.C. § 1344(c) (Supp. IV). This veto power will be discussed in more detail, *infra*.

23. The EPA Administrator has promulgated interim final guidelines, 40 C.F.R. Part 230, 40 Fed.Reg. 11292 (Sept. 5, 1975).

24. The Department of the Army recognizes that the Administrator's, but not a state's, veto power is applicable to the dredging projects of the Corps of Engineers. 33 C.F.R. § 209.-145(b)(1) (1975), which is applicable to the dredging projects of the Corps, 33 C.F.R. § 209.145(a) (1975), provides, in relevant part:
  * * * Furthermore, the Administrator can prohibit or restrict the use of any defined area as a disposal site whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such areas will have an unacceptable adverse effect on municipal water supplies, shell fish beds and fishery areas, wildlife or recreation areas.
  Another explanation of the final version of the Amendments was provided by Senator Muskie, who explained the final version in the following terms:

As enacted, § 404 of the Amendments, 33 U.S.C. § 1344 (Supp. IV), follows the House version in placing the authority for issuing permits for the discharge of dredged spoil in the Secretary of the Army, acting through the Chief of Engineers. However, subsection (b) of § 404 requires the Secretary of the Army to apply guidelines developed by the EPA Administrator, in conjunction with the Secretary of the Army, in specifying disposal sites.[23] If the guidelines would alone prohibit the specification of a disposal site, the Secretary of the Army may also consider "the economic impact of the site on navigation and anchorage." § 404(b), 33 U.S.C. § 1344(b) (Supp. IV). Subsection (c) of § 404 gives the EPA Administrator a veto power over the specification and use of defined areas as disposal sites when he determines "that the discharge of [dredged or fill] such materials into such area[s] will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." [24]

PERMITS FOR DREDGED OR FILL MATERIAL [Section 404]
  A major difference between the Senate bill and the House amendment related to the issue of dredging. The Senate Committee had reported a bill which treated the disposal of dredged spoil like any other pollutant. Pursuant to an amendment accepted on the Senate floor, dredged spoil disposal was made subject to a different set of criteria to determine any environmental effects. The House bill not only established a different set of criteria to determine the environmental effects of dredged spoil disposal but also designated the Secretary of the Army rather than the Administrator of the Environmental Protection Agency as the permit issuing authority. The Conference agreement follows those aspects of the House bill which related to the Secretary of the Army's regulatory authority. However, consistent with the Senate provision, the Administrator of the Environmental Protection Agency has three clear responsibilities and authorities.
  First, the Administrator has both responsibility and authority for failure to obtain a Section 404 permit or comply with the condition thereon. Section 309 authority is available because discharge of the "pollutant"

The Conference Committee report, like the House and Senate Committee reports, expressed the intent that dredging activities necessary for the maintenance of commerce not be unreasonably impeded:

> The Secretary and the Administrator shall act promptly on dredging permits essential for the maintenance of interstate commerce because of the seasonal nature of dredging and the need to pre-schedule scarce dredging equipment.

> It is expected that until such time as feasible alternative methods for disposal of dredged or fill material are available, unreasonable restrictions shall not be imposed on dredging activities essential for the maintenance of interstate and foreign commerce. Consistent with the intent of this Act, the conferees expect that the disposal activities of private dredgers and the Corps of Engineers will be treated similarly.

S.Rep.No.92–1236, *supra* at 142; 1 Leg.Hist. at 325, U.S.Code Cong. & Admin.News 1972, p. 3819.

■ The State of Minnesota is subject to the authority of the United States Government in the matter before us. We start with the

> seminal principle of our law "that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective states and cannot be controlled by them." *McCulloch v. Maryland,* 4 Wheat. (17 U.S.) 316, 426, 4 L.Ed. 579, 606 (1819). From this principle is deduced the corollary that

> "[i]t is the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operation from their own influence." *Id.,* at 427, 4 L.Ed., at 606.

The effect of this corollary, which derives from the Supremacy Clause and is exemplified in the Plenary Powers Clause giving Congress exclusive legislative authority over federal enclaves purchased with the consent of a State, is "that the activities of the Federal Government are free from regulation by any state." As Mr. Justice Holmes put it in *Johnson v. Maryland,* 254 U.S. 51, 57, 41 S.Ct. 16, 17, 65 L.Ed. 126, 129 (1920),

> "the immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them . . . . ."

Taken with the "old and well-known rule that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign" "without a clear expression or implication to that effect," this immunity means that where "Congress does not affirmatively declare its instrumentalities or property subject to regulation," "the federal function must be left free" of regulation. Particular deference should be accorded that "old and well-known rule" where, as here, the rights and privileges of the Federal Government at stake not only find their origin in the Constitution, but are to be divested in favor of and subjected to regulation by a subordinate sovereign. *Because of the fundamental importance of the principles shielding federal installa-*

---

dredge spoil without a permit or in violation of a permit would violate Section 301(a).

Second, the Environmental Protection Agency must determine whether or not a site to be used for the disposal of dredged spoil is acceptable when judged against the criteria established for fresh and ocean waters similar to that which is required under Section 403.

Third, prior to the issuance of any permit to dispose of spoil, the Administrator must determine that the material to be disposed of will not adversely affect municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife or recreational areas in the specified site. Should the Administrator so determine, no permit may issue.

1 Leg.Hist. at 177.

*tions and activities from regulation by the States, an authorization of state regulation is found only when and to the extent there is "a clear congressional mandate," "specific congressional action" that makes this authorization of state regulation "clear and unambiguous."*

*Hancock v. Train,* 426 U.S. 167, 178, 96 S.Ct. 2006, 2012, 48 L.Ed.2d 555 (1976) (footnotes omitted and emphasis added).[25]

With these considerations and the Congressional debates in mind, we look to the principal arguments relied upon by the State, namely §§ 313, 33 U.S.C. § 1323 (Supp. IV), and 510, 33 U.S.C. § 1370 (Supp. IV), of the Amendments.

Minnesota seeks to find support for its position by virtue of the fact that Congress, in § 313, removed an asserted ambiguity in the prior law, § 21(a) of the Water Quality Improvement Act of 1970, 33 U.S.C. § 1171(a) (1970), by requiring federal agencies to "comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements * * *."[26] There is no doubt that the prior law as to the duty of Federal facilities and activities to comply with the requirements of pollution control laws has been strengthened but this strengthening does not directly address the problem at hand: Whether Congress intended to waive the immunity of the Corps of Engineers from state regulation of those dredging activities of the Corps which are essential for the maintenance of interstate commerce. Nor is there any indication in the legislative history of § 313 that Congress intended to subject the disposal of dredged material by the Corps to state law.

■ Section 313 constitutes a general authorization on the part of Congress, that "[e]ach * * * agency * * * of the Federal Government * * * shall comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution." Minnesota urges that the words are clear and unambiguous and hence there is no need to look at the legislative history or other sections of the Amendments. We have seen, however, only recently, that § 313 is to be construed in the light of the Congressional intent with respect thereto. *State Water Resources Control Board, supra.* The problem arises from the fact that words do not construe themselves.

It would be anomalous to close our minds to persuasive evidence of intention on the ground that reasonable men could not differ as to the meaning of the words. Legislative materials may be without probative value, or contradictory, or ambiguous, it is true, and in such cases will not be permitted to control the customary meaning of words or overcome rules of syntax or construction found by experience to be workable; they can scarcely be deemed to be incompetent or irrelevant. (Citation omitted.) The meaning to be ascribed to an Act of Congress can only be derived from a considered weighing of every relevant aid to construction.

*United States v. Dickerson,* 310 U.S. 554, 562, 60 S.Ct. 1034, 1038, 84 L.Ed. 1356 (1940) (Murphy, J.) (footnote omitted).[27]

---

**25.** *See also State Water Resources Control Board, supra,* respecting the Act before us:

Our decision in this case is governed by the same fundamental principles applied today in *Hancock v. Train,* * * *: federal installations are subject to state regulation only when and to the extent that congressional authorization is clear and unambiguous. As in *Hancock v. Train,* we must determine whether Congress has subjected federal installations to the degree of state control urged by the States.

at 211, 96 S.Ct. at 2028.

**26.** Section 21(a) of the 1970 Act provided in relevant part:

Each Federal agency * * * having jurisdiction over any real property or facility, or engaged in any Federal public works activity of any kind, shall, consistent with the paramount interest of the United States as determined by the President, insure compliance with applicable water quality standards and the purposes of this Act in the administration of such property, facility, or activity.

**27.** *See also Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974).

Moreover, a statute will not be read literally if such a reading leads to a result that conflicts with Congress' intent. In *Helvering v. New York Trust Co.*, 292 U.S. 455, 464–65, 54 S.Ct. 806, 808, 78 L.Ed. 1361 (1934), in addressing this point the Court stated:

But the expounding of a statutory provision strictly according to the letter without regard to other parts of the act and legislative history would often defeat the object intended to be accomplished. * * Quite recently in *Ozawa v. United States*, 260 U.S. 178, page 194 [43 S.Ct. 65, 67, 67 L.Ed. 199], we said: "It is the duty of this Court to give effect to the intent of Congress. Primarily this intent is ascertained by giving the words their natural significance, but if this leads to an unreasonable result, plainly at variance with the policy of the legislation as a whole, we must examine the matter further. We may then look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning in order that the purpose may not fail."

Thus, what is asserted to be the literal meaning of § 313 must be interpreted to give effect to the intent of Congress that the Corps is not to be hampered in maintaining navigation.[28] What we are here dealing with is a specific agency, the Corps of Engineers, performing a specific federal function, the clearing of the channels of interstate commerce for purposes of navigation,[29] its responsibility being delineated in a special section of the Act, § 404, 33 U.S.C. § 1344 (Supp. IV). Unlike all other pollutants, dredged spoil is not regulated under the NPDES, § 402, 33 U.S.C. § 1342 (Supp. IV), since § 402(a)(1) establishing the NPDES begins, as we have seen,[30] with the words, "[e]xcept as provided in sections 318 and 404." [31]

With respect to § 510, 33 U.S.C. § 1370 (Supp. IV), quoted *supra* at p. 1202, Minnesota asserts that "[t]his unequivocal language was passed in direct response to claims such as the Corps is making in this case." [32] A careful reading of § 510, however, makes it clear that this section does not purport to grant the states any new authority. By its terms, § 510 is designed only to prevent the Amendments from "preclud[ing] or deny[ing] the right of any State * * * to adopt or enforce" pollution control requirements. Thus it prevents the Amendments from pre-empting the states from adopting higher pollution control standards than those established under the Amendments.[33] The Corps does not argue pre-emption. Section 510 does not address the issue of state control over the Corps' dredging essential for the purpose of maintaining navigation.

There is a suggestion by amici that failure to impose upon the Corps of Engineers the requirements of state water pollution control may result in action by the Secre-

28. The intent of the Congress to maintain navigation finds further support in § 511(a)(2), 33 U.S.C. § 1371(a)(2) (Supp. IV), stating that the 1972 Amendments "shall not be construed as * * * affecting or impairing the authority of the Secretary of the Army (A) to maintain navigation * * *."

29. That Federal power over navigation and navigable waters is plenary and predominant, *see Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 334, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958).

30. *Supra* at 1202.

31. That dredged spoil is not regulated under the NPDES is true whether the NPDES permit program is administered by EPA pursuant to § 402(a), or by a state, pursuant to § 402(b). As can be seen from the structure of § 402 (*E. g.*, § 402(a)(3), stating that the NPDES program is subject to "the same terms, conditions, and requirements" whether administered by the states or EPA, as well as § 402(c), stating that any state permit program under this section shall be in accord with § 402), the NPDES is a particularized unitary program. Thus state-administered NPDES permit programs, as well as EPA-administered NPDES programs are limited by the exceptions delineated in § 402(a)(1).

32. Brief for Minnesota at 15.

33. *See also* H.R.Rep.No.92–911, *supra* at 136, 1 Leg.Hist. at 823.

tary of the Army inimical to proper environmental considerations. The Act is not so construed by the Army and the EPA. Both the EPA guidelines [34] and the Army's regulations [35] bear directly on this point. Under the guidelines, evaluation criteria, expressly made applicable to the Corps of Engineers,[36] are developed for all proposed discharges of dredged or fill material.[37] The regulations controlling the Corps, in turn, require the Corps to consider the environmental, as well as the social and economic consequences of its civil projects.[38] It appears also [39] that the Corps is currently conducting a study of the environmental effects of the disposal of dredged material,[40] which, we are also told, is being applied in implementing § 404, 33 U.S.C. § 1344 (Supp. IV), to assure that all discharges of dredged material result in the least environmental harm possible.

■ In light of the principles we have discussed, the Supremacy Clause, the legislative history of the Act, as well as its internal structure, we find with respect to the disposal of dredged material by the Corps, that there is insufficient evidence to meet the clear and unequivocal standard for finding Congressional authorization for state regulation under the teachings of *Hancock, supra,* and *State Water Resources Control Board, supra,* whether by authorization under the NPDES or independently thereof. Although environmental consider-

ations were matters of grave concern to the Congress, and obviously so to both the Environmental Protection Administration and the Secretary of the Army, as appears clearly from their respective guidelines and regulations, the overriding concern of the Congress in this context was for the maintenance of unimpeded traffic in the navigable waters of the United States. Regulation by the various States of the Union, each with its own requirements, could result in a conceivably chaotic situation as riverborne traffic moved from the boundaries of one state to those of another. We find no authorization of such state regulation in the legislative history of the Act or its several sections. We hold that the Congress did not intend a subordination of the federal power and authority in this area to State control.

Reversed and remanded for entry of judgment in accordance herewith.

34. 40 C.F.R. Pt. 230, 40 Fed.Reg. 41292 (Sept. 5, 1975).

35. 33 C.F.R. Pt. 209, *as amended,* 40 Fed.Reg. 31320 (July 25, 1975).

36. 40 C.F.R. § 230.1(b)(2), 40 Fed.Reg. 41293 (Sept. 5, 1975).

37. The evaluation criteria are stated in 40 C.F.R. §§ 230.4–230.5, 40 Fed.Reg. 41294–96.

38. *See* 33 C.F.R. § 209.410 (1975); 33 C.F.R. § 209.145(f) (1975).

39. *See* Reply Brief for Appellants at 4.

40. Authorized by the River and Harbor Act of 1970 § 123(i), 33 U.S.C. § 1165a(i) (1970).