PEOPLE OF the STATE OF CALIFOR-
NIA ex rel. STATE AIR RESOURCES
BOARD and ex rel. Bay Area Air Pollu-
tion Control District, Plaintiffs,

v.

The DEPARTMENT OF the NAVY
et al., Defendants.

No. C–76–0045 WHO.

United States District Court,
N. D. California.

April 12, 1977.

Roderick Walston, Daniel J. Taaffe, Deputy Attys. Gen., San Francisco, Cal., for Air Resources Board.

John F. Powell, Richard W. Grieves, San Francisco, Cal., Bay Area Air Pollution Control Dist., for Bay Area Pollution Control District.

James L. Browning, U. S. Atty., Francis B. Boone, Asst. U. S. Atty., San Francisco, Cal., for defendant.

## OPINION AND ORDER

ORRICK, District Judge.

The State of California brings this action at the instance of the State Air Resources Board and the Bay Area Air Pollution Control District against the United States Department of the Navy (the Navy) and individual naval officers claiming that the level of air pollution from certain of defendant Navy's jet engine test cells violates air quality standards promulgated pursuant to the federal Clean Air Act (the Act), 42 U.S.C. § 1857 *et seq.*, thereby entitling plaintiffs to civil penalties and equitable relief.

Defendants now move to dismiss on the grounds that this suit is barred by sovereign immunity, by plaintiffs' alleged failure to comply with the notice requirements of Section 304(b) of the Act, by plaintiffs' alleged failure to hold hearings and make determinations in accordance with Section 39002 of the California Health and Safety Code, by plaintiffs' alleged failure to join necessary parties, by federal preemption under Section 233 of the Act, by Section 111 of the Act, by plaintiffs' alleged utilization of invalid and/or inappropriate emission standards, and by the insignificancy of defendants' alleged violations. Defendants also move to dismiss plaintiffs' claim for civil penalties on the ground that such penalties are not assessable against the United States. For the reasons hereinafter stated, the Court denies each of these motions to dismiss, except the motion to dismiss plaintiffs' claim for civil penalties, which the Court grants.

### I.

Before dealing with each of defendants' grounds for dismissal, we examine the statutory scheme as well as the bases for plaintiffs' claim. The Act imposes upon the Administrator of the Environmental Protection Agency (EPA) the responsibility for promulgating primary and secondary standards for ambient air quality. § 109, 42 U.S.C. § 1857c–4. However, the Act gives the states primary responsibility for implementing these standards—the states are obliged to develop and adopt "implementation plans" which, after EPA approval, are published as regulations in the Federal Register. § 110, 42 U.S.C. § 1857c–5. These "implementation plans" may contain pollution requirements which are more but not less strict than EPA standards promulgated under Section 109. *Indiana & Michigan Electric Co. v. EPA,* 509 F.2d 839 (7th Cir. 1975); *St. Joe Minerals Corp. v. EPA,* 508 F.2d 743 (3d Cir. 1975), *vacated on other grounds,* 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976).[1]

1. The scheme of Section 110 of the Clean Air Act also provides for the *EPA* to step in and promulgate implementation plans for states which either have failed to submit plans of

■ Despite the states' broad power to implement standards under Section 110, however, the Act preempts certain state regulation of moving sources of pollution. The EPA is given general and exclusive authority to set emission limitations for new motor vehicles, 42 U.S.C. § 1857f–6a, to set emission limitations for aircraft, 42 U.S.C. § 1857f–11, and to regulate the sale of motor vehicle fuels and fuel additives, 42 U.S.C. § 1857f–6c(c)(4).

■ Thus, the general scheme of the Act might be said to encompass state regulation of "stationary sources" under Subchapter I (Section 110 in particular)[2] and federal (EPA) regulation of "moving sources" under Subchapter II. However, this dichotomy is only general. First, Section 110 does not specifically limit state regulation to "stationary sources".[3] Second, federal preemption under Subchapter II only extends to *certain* regulation of moving sources. Third, aside from these specific federal preemptions, the *states* retain residual authority to regulate pollution. 42 U.S.C. § 1857d–1; *see also Washington v. General Motors Corp.,* 406 U.S. 109, 115 n. 4, 92 S.Ct. 1396, 31 L.Ed.2d 727 (1972). Thus, although the Subchapter II preemptions provide for federal regulation of much "moving source" pollution, regulation of the remainder of such pollution, as well as general regulation of "stationary source" pollution, resides with the states under Subchapter I.

Plaintiffs claim that emissions from defendant Navy's jet engine test cells in Orange, Alameda, and San Diego Counties exceed state and local air pollution standards approved by the EPA in the California Implementation Plan. 37 Fed.Reg. § 19812; 40 C.F.R. § 52.220. These test cells are large, concrete structures which house aircraft engines for testing, repair, and maintenance *prior* to their installation in the aircraft itself. With the exception of water used to cool the engine exhaust gases and to protect the test cell and its noise abatement material, all emissions during test cell operations originate in the engine. However, all emissions enter the ambient or outside air from test cell smoke stacks, and it is at this point of entry that emissions allegedly violate federally approved state and local regulations.

The Court now considers *seriatim* the various grounds on which defendants move to dismiss.

## II.

■ At the outset, defendant claims that this lawsuit must be dismissed for lack of subject matter jurisdiction and that it is barred by sovereign immunity. These claims fail, however, under the recent Supreme Court case of *Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976). *Hancock* explicitly indicates that Section 118 of the Act, 42 U.S.C. § 1857f, establishes the duty of federal installations

---

their own or have submitted plans not in accordance with Act requirements. § 110(c)(1), 42 U.S.C. § 1857c–5(c)(1). This EPA power is largely irrelevant to the instant case, however, since the California Implementation Plan involved here *has* been approved and published by the EPA Administrator. 37 Fed.Reg. § 19812; 40 C.F.R. § 52.220.

2. Again, although underside limits are provided by the EPA pursuant to Section 109 of the Clean Air Act, stationary source standards are effectively set by state implementation plans under Section 110. It should also be noted that pollution standards for *new* "stationary sources" are to be promulgated by the EPA in the first instance. § 111, 42 U.S.C. § 1857c–6. Implementation of *these* standards pursuant to a state plan is permissive under Section 111 in contrast to obligatory state implementation of

standards for *existing* stationary sources under Section 110.

3. In fact, state implementation plans must specifically include (without being limited to) land-use and transportation controls. § 110(a)(2)(B), 42 U.S.C. § 1857c–5(a)(2)(B). Further indications that basic state authority under Subchapter I (Section 110 in particular) of the Act extends well beyond "stationary sources" may be found in, among other sections, Section 108(a)(1)(B), 42 U.S.C. § 1857c–3(a)(1)(B) (read in conjunction with Section 109(a)(1)(A) and Section 110(a)(1)), Section 110(a)(2)(G), 42 U.S.C. § 1857c–5(a)(2)(G) and Section 110(f)(1), 42 U.S.C. § 1857c–5(f)(1). *See also South Terminal Corp. v. EPA,* 504 F.2d 646, 668 (1st Cir. 1974).

to comply with state implementation standards, and that, sovereign immunity notwithstanding, Section 304, 42 U.S.C. § 1857h-2, provides the means of enforcing that duty in federal court:

"There is agreement that § 118 obligates existing federal installations to join nonfederal sources in abating air pollution, that comparable federal and nonfederal sources are expected to achieve the same levels of performance in abating air pollution, and that those levels of performance are set by the States." *Hancock v. Train, supra,* 426 U.S. at 182, 96 S.Ct. at 2014.

Therefore, the Court has jurisdiction of this case under Section 304 of the Act.

### III.

Next, defendants contend that because plaintiffs have failed to comply with the notice requirements of Section 304(b) and because the conditions upon which sovereign immunity is waived must be strictly adhered to, this suit is barred.

█ While the Court agrees, in general, that the limitations and conditions upon which the government consents to be sued must be strictly observed (*Soriano v. United States,* 352 U.S. 270, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *Smoke Rise, Inc. v. Washington Suburban Sanitary Commission,* 4 CCH Employment L. Rep. § 20427 (D.Md.1974)), the Court finds that the notice requirements of Section 304(b) *have* been sufficiently complied with in this case.

Section 304(b) of the Act, 42 U.S.C. § 1857h-2(b), provides:

"No action may be commenced—
(1) under subsection (a)(1)—
(A) prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order * * *."

The service and contents of Section 304(b) notice are further specified in 40 C.F.R. § 54:

"§ 54.2 *Service of notice.*
(a) Notice to Administrator: Service of notice given to the Administrator under this part shall be accomplished by certified mail addressed to the Administrator, Environmental Protection Agency, Washington, D.C. 20460. Where notice relates to violation of an emission standard or limitation or to violation of an order issued with respect to an emission standard or limitation, a copy of such notice shall be mailed to the Regional Administrator of the Environmental Protection Agency for the Region in which such violation is alleged to have occurred.

\* \* \* \* \* \*

(c) Notice to alleged violator: Service of notice given to an alleged violator under this part shall be accomplished by certified mail addressed to, or by personal service upon, the owner or managing agent of the building, plant, installation, or facility alleged to be in violation of an emission standard or limitation, or an order issued with respect to an emission standard or limitation. Where the alleged violator is a corporation, a copy of such notice shall be sent by certified mail to the registered agent, if any, of such corporation in the State in which such violation is alleged to have occurred.
§ 54.3 *Contents of notice.*

\* \* \* \* \* \*

(b) *Violation of standard, limitation or order.* Notices to the Administrator, States, and alleged violators regarding violation of an emission standard or limitation or an order issued with respect to an emission standard or limitation, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order which has allegedly been violated, the activity alleged to be in violation, the person or persons responsible for the alleged violation, the date or dates of such violation, and the full name and address of the person giving the notice."

The instant lawsuit was filed on January 9, 1976. Five months prior, on August 8, 1975, William Simons, Executive Officer of

plaintiff Air Resources Board, sent letters to Commander Philip J. Parisius of the Naval Facilities Engineering Command in San Bruno, California, and to Region IX of the EPA. Those letters listed jet engine test cells, owned and operated by defendant Navy in California, which were in violation of state pollution opacity standards. The letters also evidenced plaintiffs' clear intention to have the California Attorney General file a federal lawsuit to enjoin and fine defendants' violations. Finally, the letters clearly indicated that the battleground of this litigation would be, as it certainly now is, federal "preemption" under Section 233 of the Act. 42 U.S.C. § 1857f–11.

Thereafter, on June 29 and July 1, 1976, plaintiffs gave additional notice to defendants and to the EPA Administrator; *this* notice complied to the letter with the standards set forth in 40 C.F.R. § 54. In other words, after *Hancock v. Train, supra,* made clear the facts that Section 304 applied to states as well as "citizens" and that jurisdiction to sue the Navy for Act violations under statutes other than Section 304 was suspect, plaintiffs made *certain* that their compliance with 40 C.F.R. § 54 was absolutely literal.

Defendants argue that plaintiffs' failure to effect such absolutely literal compliance with 40 C.F.R. § 54 in carrying out the August 8, 1975, notices mandates dismissal of this action, citing *City of Highland Park v. Train,* 519 F.2d 681 (7th Cir. 1975), and *Massachusetts v. United States Veterans Administration,* 541 F.2d 119 (1st Cir. 1976). Plaintiffs, on the other hand, contend that since they substantially complied with the notice requirements of Section 304(b), dismissal is not warranted here.

■ Despite defendants' argument that compliance with Section 304(b) must be perfectly literal and not merely substantial, the cases do not bear this conclusion out. *City of Highland Park v. Train, supra,* 519 F.2d at 691, dismissed a Clean Air Act suit because "plaintiffs made *no attempt whatsoever* to comply with the notice provision" of Section 304(b) (emphasis added); the implication is, if anything, that some forms of

substantial compliance do suffice for Section 304(b) purposes. This implication is bolstered by the fact that the *Highland Park* court viewed the case of *Metropolitan Washington Coalition for Clean Air v. District of Columbia,* 373 F.Supp. 1089 (D.D.C. 1974), as consistent with its own holding, having described that case as follows:

"The plaintiffs in *Metropolitan Washington Coalition,* although they failed to give the required sixty-day notice before filing their first complaint, filed a subsequent complaint raising the same issues more than sixty days after the service of the first. This, as the court held, *in substance* afforded the Administrator the sixty-day notice to which he was entitled under section 304(b)." *City of Highland Park v. Train, supra,* 519 F.2d at 690 n. 4 (emphasis added).

In this case, plaintiffs' compliance with Section 304(b) was even more "substantial" than the compliance evidenced by the facts of *Metropolitan Washington Coalition.*

Similarly, in *Massachusetts v. United States Veterans Administration, supra,* plaintiff argued that the notice requirements of Section 505(b) of the Federal Water Pollution Act (essentially identical to Section 304(b) of the Act) had been substantially complied with because, under the circumstances of that case, the purposes behind notice could not possibly have been served by the giving of actual notice. In rejecting this argument, the court did *not* reject the *principle* of substantial or constructive compliance, but merely held that plaintiff had made no *prima facie* case for the futility of notice in the situation involved. Again, plaintiff had apparently made *no* attempt to comply with notice standards and, again, the *Veterans Administration* court intimated its acceptance of the constructive compliance notion, citing *NRDC v. Callaway,* 524 F.2d 79, 84 n. 4 (2d Cir. 1975). *See also Minnesota v. Callaway,* 401 F.Supp. 524 (D.Minn.1975). Thus, there exists at least implicit precedent for the application of a substantial compliance principle here.

**1278**

In the instant case, not only have the purposes behind Section 304(b) been satisfied, but notice was also *effectively* given to the proper parties. The purposes behind Section 304(b) are to encourage voluntary compliance and/or administrative settlement of claims with a view toward relieving already overburdened federal courts of precipitate litigation. *City of Highland Park v. Train, supra,* 519 F.2d at 690; *NRDC v. Callaway, supra,* 524 F.2d at 84 n. 4. Here, the letters of August 8, 1975, clearly attempted to effectuate these purposes by urging voluntary, out-of-court compliance and by effectively affording the EPA an opportunity to take administrative action.

The apparent defects in plaintiffs' August 8, 1975, notice are as follows: First, the EPA letter was sent to Region IX and not to the EPA Administrator in Washington, D.C., as allegedly required by 40 C.F.R. § 54. Second, the Navy letter was sent to Commander Parisius and not to the agent authorized to receive service for the Navy, as allegedly required by 40 C.F.R. § 54. Third, the letters *may* not have been as detailed as 40 C.F.R. § 54.3(b) *might* be said to require.

Clearly, notice to Region IX *effectively* put the EPA on notice for all Section 304(b) purposes; in fact, had the EPA considered taking action in this case, Region IX (in which violations were occurring) would certainly have been most actively involved. In addition, notice to Commander Parisius *effectively* put defendants, including the Navy, on notice for Section 304(b) purposes. Commander Parisius is the Environmental Protection Officer for the Western Division of the Naval Facilities Engineering Command; he has filed affidavits and has extensively assisted in the defense of this lawsuit. Indeed, notice to Commander Parisius, in all probability, put defendants on notice in the *most* effective manner for Section 304(b) purposes. Furthermore, the

Court finds that the contents of the letters *effectively* (albeit without great detail) informed the recipients of the violations alleged, the standards violated, the locations of the violations, etc. Moreover, defendant Navy was not only aware of this intended lawsuit as of August 8, 1975, but its stance, it seems, had already been articulated—a determination had apparently been made to defend on the principal ground of preemption under Section 233. Thus, administrative settlement has, all along, been unlikely since the parties have deadlocked, from the outset, over an issue highly conducive to court resolution, *i. e.,* the question of interpreting Section 233. There are also indications that settlement discussions antedated the August, 1975, notice.

In sum, the Court cannot now conscionably dismiss this action for failure to meticulously comply with 40 C.F.R. § 54. It is clear that actual and effective notice more than substantially observed the alleged requirements of 40 C.F.R. § 54 and, therefore, Section 304(b). Defendants have made no showing of prejudice due to defective notice and no showing that the purposes behind Section 304(b) have been in any way dishonored. Indeed, it appears conclusively that no such prejudice exists and that the statutory purposes have been abundantly served. Although, as stated, strict compliance with Section 304(b) appears necessary, the word "strict" must be construed in light of these statutory purposes. Therefore, failure to observe 40 C.F.R. § 54 in absolutely literal fashion is not grounds for dismissal of this entire action because, *in this case,* minor deviations from the letter have not in any way interfered with the effectuation of legislative design.

Finally, since more than sixty days have now passed since plaintiffs' *literal* compliance with 40 C.F.R. § 54 on June 29 and July 1, 1976, no purpose would be served by dismissing here since plaintiffs could and would *immediately* refile this lawsuit.[4]

4. Defendants claim, however, that there is a "short answer" to plaintiffs' argument that this suit could immediately be refiled—the Navy is not a suable entity, citing *Blackmar v. Guerre,*

342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534 (1952), and *New Haven Public Schools v. General Services Administration,* 214 F.2d 592 (7th Cir. 1954). Yet these cases are inapposite. Here

Dismissal now would be, in effect, the ultimate disservice to judicial economy. *See, e. g., Minnesota v. Callaway, supra.*

## IV.

█ Defendants contend that the instant suit is barred by the failure of plaintiff State Air Resources Board to hold hearings and make determinations in accordance with Section 39002 of the California Health and Safety Code which provides:

"Local and regional authorities have the primary responsibility for control of air pollution from all sources other than vehicular sources. The control of vehicular sources, except as otherwise provided in this division, shall be the responsibility of the State Air Resources Board. Except as otherwise provided in this division, including, but not limited to Sections 41809, 41810, and 41904, local and regional authorities may establish stricter standards than those set by law or by the state board for nonvehicular sources. However, the state board shall, *after holding public hearings as required in this division,* undertake control activities in any area wherein it determines that the local or regional authority has failed to meet the responsibilities given to it by this division or by any other provision of law." (Emphasis added by defendants.)

There is *no* indication, however, that Section 39002 of the California Code in any way describes prerequisites to suit under Section 304, 42 U.S.C. § 1857h–2, of the federal Act; in fact, all indications are to the contrary. Section 39002 makes the aforementioned hearing and determinations prerequisites to the Board's ability to "undertake control activities" on a regional level. The purpose is, under certain circumstances, to *enlarge* the Board's general powers where local districts have been programmatically deficient. This section does not diminish the authority of the Board to initiate litigation under the Act; indeed, Section 39002 has no relevance to this suit to enforce standards which have been duly promulgated via approval of the California Implementation Plan.

On the other side, the California Code sections which *do* have relevance to state enforcement authority (Cal.Health & Saf. Code §§ 41512 and 42403) along with the federally recognized California Implementation Plan (40 C.F.R. § 52.220) make no reference to the alleged Section 39002 preconditions. Indeed, Section 41509 of the California Health and Safety Code explicitly provides:

"No provision of this division, or of any order, rule, or regulation of the state board or of any district, is a limitation on:

\* \* \* \* \* \*

(b) The power of the Attorney General, at the request of a local or regional authority, the state board, or upon his own motion, to bring an action in the name of the people of the State of California to enjoin any pollution or nuisance.

(c) The power of a state agency in the enforcement or administration of any provision of law which it is specifically permitted or required to enforce or administer."

In sum, the alleged failure of plaintiff State Air Resources Board to hold hearings and

(unlike *Blackmar* where the Hatch Act was found *not* to authorize suit against the Civil Service Commission), the Clean Air Act subjects "*each* department, agency and instrumentality of the executive, legislative and judicial branches of the Federal Government" (emphasis added) to state pollution standards, 42 U.S.C. § 1857f, and permits suit against "the United States and *any* other government instrumentality or agency" (emphasis added) for violation of such standards, 42 U.S.C. § 1857h–2. In addition, the legislative history of the Clean Air Act Amendments of 1970 evidences Congress' particular desire to make *all* federal facilities more responsible for pollution abatement. P.L. 91–604, U.S.Code Cong. & Ad. News (1970) at p. 5360; *Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976). Moreover, in *Hancock,* suit was directed against the United States Army and there seems to have been no doubt about the Army's basic amenability to Clean Air Act litigation under Section 304 although, of course, amenability to state *permit* requirements was ultimately denied. Therefore, the answer to defendants' "short answer" is that the Navy *is* a proper defendant in this lawsuit.

make determinations in accordance with Section 39002 of the California Health and Safety Code does not stand as a bar to the instant suit.

### V.

██ Defendants next contend that this suit must be dismissed as lacking necessary parties within the meaning of Rule 19(a) of the Federal Rules of Civil Procedure. This claim arises from the fact that while the Bay Area Air Pollution Control District has joined with the State Air Resources Board and the California Attorney General in prosecuting this suit, the Southern California and San Diego Air Pollution Districts have not added themselves as plaintiffs, *despite* the fact that this litigation encompasses violations occurring within those Districts. Thus, defendants allege, in rather general terms, that this action must be dismissed because the absence of the Southern California and San Diego Districts will prevent these Districts from protecting their own interests, will subject defendants to multiple and inconsistent standards promulgated by each district and will, therefore, render a full and meaningful adjudication of this case impossible.

First, it should be noted that, since the absent Districts appear to be within the jurisdiction of this Court, their joinder is "feasible" and, therefore, even *were* these Districts to be considered "necessary parties" within the meaning of Rule 19(a), dismissal of this lawsuit would not follow. In other words, the real question for decision is: Should these parties be joined, as either voluntary or involuntary plaintiffs, under Rule 19(a)?[5]

██ Again, it is quite clear that these Districts do have interests in the outcome of this litigation insofar as it relates to violations by Navy test cells in their respective jurisdictions. However, this case is clearly one of statewide concern and the interests of the absent Districts within their respective jurisdictions appear to be identical to the interests of the State Air Resources Board and the California Attorney General in prosecuting this suit. Under California law, the State Air Resources Board and the California Attorney General are appropriate and sufficient parties for bringing civil suit to enforce local as well as state pollution standards. *See* Cal.Health & Saf.Code §§ 41509 and 41512.

Thus, it seems obvious that, in terms of Rule 19(a), complete relief can and will be afforded the parties to this litigation even without the joinder of the absent Districts. Furthermore, since the Board and Attorney General are, in this case, seeking to enforce and protect the regional interests of the Southern California and San Diego Districts, there is no apparent danger of prejudice to those interests here. Certainly, these Districts are aware of this lawsuit and are quite capable of determining how best to legally foster and defend their rights; if anything, their absence here implies a determination that the current plaintiffs *will* adequately protect their interests. Finally, since the current plaintiffs seek to, and are fully competent to, enforce *both* state and *local* standards here (encompassing the standards of the absent Districts), there seems to be little or no risk that defendants will be subjected to multiple or inconsistent standards. At any rate, de-

---

**5.** Rule 19(a) of the Federal Rules of Civil Procedure provides:

 "*Persons to Be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his abili-

ty to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action."

fendants have failed to allege *any specific* prejudice, potential or real, that might accrue from nonjoinder of the absent Districts.

In sum, joinder of the Southern California and San Diego Districts is not necessary to the continuation of this suit.[6]

## VI.

As all parties agree, the crux of these motions is defendants' claim that this lawsuit is preempted by Section 233 of the Act (42 U.S.C. § 1857f–11), which provides:

"No State or political subdivision thereof may adopt or attempt to enforce any standard respecting emissions of any air pollutant from any aircraft or engine thereof unless such standard is identical to a standard applicable to such aircraft under this part."

The preemptive intent of Section 233 is explicit—the states are clearly preempted from adopting or enforcing regulations "respecting emissions of any air pollutant from any aircraft or engine thereof", and this regulatory power is vested exclusively in the federal government under Sections 231–234. In addition, the fact that Section 233 preempts state authority to establish or impose any aircraft emission standard is clearly expressed in both the legislative history and the case law. P.L. 91–604, U.S.Code Cong. & Ad.News (1970) at p. 5359. *Washington v. General Motors Corp., supra.*

However, while the *existence* of a preemption is quite manifest here, the *scope* of this preemption is hotly contested. Clearly, *direct* state regulation of aircraft engine structure is preempted—states cannot require (directly or indirectly) as pollution control measures, for example, changes in engine design or attachments to the engine itself. Therefore, the Court will not grant such relief in this litigation. In fact, plaintiffs do not *seek* such relief but seek only state regulation of the *test cell* —changes in the concrete immobile structures which temporarily house the engines during repair, maintenance, etc.[7]

### A.

Defendants contend, however (thereby rendering the scope of Section 233 the central issue here), that even such state regulation (of the test cell) is preempted by Section 233. Initially, defendants' argument focuses on the general notion that, under the Act, states are to regulate "stationary sources" while regulation of "moving sources" of pollution is federally reserved. From this premise, defendants contend, citing *South Terminal Corp. v. EPA,* 504 F.2d 646 (1st Cir. 1974), that test cells are not "stationary sources" (essentially because the engines and not the cells are the "sources" of pollution), and, therefore, are not subject to state regulation.

However, *South Terminal,* 504 F.2d at 668 n. 24, merely holds that parking structures are "indirect sources" and not "stationary sources" because they "themselves emit no pollutants but instead only attract vehicles which emit pollution".[8] Thus, first

---

6. It should be noted, however, that the interests of these Districts in this litigation are sufficient for permissive joinder under Rule 20(a) of the Federal Rules of Civil Procedure—although they need not join, they may. Section 41512 of the California Health and Safety Code appears to give control districts such standing under state law. Again, parties which may be joined under Rule 20 because of an interest in a question of law or fact are proper parties, but they are not automatically necessary or indispensable. 3A J. Moore, *Federal Practice* ¶ 19.07[1] at 2226 (2d ed. 1974).

7. Furthermore, it appears uncontroverted that such regulation is both feasible and effective— there are apparently numerous ways to modify test cell smoke stacks so that emissions introduced into the atmosphere from them can be reduced to reasonable levels in compliance with state implementation standards. In fact, it seems that defendants have studied or experimented with several such methods, including nucleation scrubbers, electrostatic precipitators, and so-called dry systems, all of which involve structural alteration of or addition to the test cell without any effect on the aircraft engine itself.

8. This definition of an "indirect source" as one attracting "moving sources" comports with 40 C.F.R. § 52.22(b)(i).

"An indirect source is defined by [this] regulation as 'a facility, building, structure,

of all, in terms of the definition of an "indirect source", test cells are quite distinguishable from parking structures (which are themselves more closely analogous to airplane hangars) because test cells do not attract "vehicles" or "moving source" pollution but only house engines *prior to* their installation in aircraft. Factories (hypothetical or real) in which engines are manufactured and from which mingled engine, machine and other exhausts enter the ambient air as pollution would certainly be considered "stationary sources". Test cells are more analogous to such factories then to airplane hangars which harbor the readily mobile aircraft. It would thus appear that test cells are most properly classifiable as "stationary sources".

█ Moreover, even if test cells *were* considered "indirect sources" it is by no means clear that such sources are beyond state regulation under Section 110. In fact, *South Terminal*, 504 F.2d at 668, itself indicates that under Section 110(a)(2)(B), 42 U.S.C. § 1857c–5(a)(2)(B), state implementation plans must include:

> " * * * such measures as may be necessary to insure attainment and maintenance of the national primary ambient air quality standards, 'including, but not limited to, land-use and transportation controls'."

Since parking structures fall under either the "land-use" or "transportation control" rubric of Section 110(a)(2)(B), *South Terminal* concludes that states *can* regulate such "indirect sources". This conclusion also follows from the general statutory scheme which, as stated, provides for state residual

authority to regulate all sources *except* those specifically preempted—the Act does not *per se* limit state regulation to "stationary sources", even though the field of "moving sources" is in large part exclusively federal. Thus, the crucial question here is not whether test cells are "stationary sources" but whether test cells are within the scope of the Section 233 preemption.

### B.

█ Under the modern doctrine of preemption, both the existence of preemption and the scope of preemption are determined by Congressional exclusionary intent. *See, e. g., Rice v. Sante Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); *New York Dep't of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973). Congressional intent can, of course, be explicit or inferred. Defendants argue that Congressional preemptive purpose is explicit here *even* as to test cells. Pointing to the language of Section 233, defendants contend that states may not enforce regulations "respecting emissions of any air pollutant from any aircraft or engine thereof" and that emissions coming out of test cell smoke stacks are still "from" the engines because the engines and not the test cells generate those emissions in the first instance. However, the Court does not read Section 233 as clearly intending this meaning.

First, emissions enter the outside air "from", emanate "from" or come "from" directly and immediately, the *test cells* and not the engines;[9] this distinction cannot be

---

or installation which attracts or may attract mobile source activities that results in emissions or a pollutant for which there is a national standard,' for example a '[p]arking facility.'" *City of Highland Park v. Train,* 519 F.2d 681, 687 (7th Cir. 1975).

9. Although defendants appear to contend, in addition, that concrete structures like test cells cannot be viewed as "sources" of emissions, Section 111, 42 U.S.C. § 1857c–6, defines "stationary source" as "any building, structure, facility, or installation which emits or may emit any air pollutant". This definition of "stationary source" as a *building* or *structure* which *emits* seems to upset defendants' entire argu-

ment that engines alone and not test cells "emit" or are the "sources" of pollution. Similarly, under Section 111 of the Clean Air Act, 42 U.S.C. § 1857c–6, the EPA Administrator is authorized to establish standards for "new stationary sources". Pursuant to this section, the Administrator has promulgated regulations with regard to portland cement plants, nitric acid plants, iron and steel mills, petroleum refineries, municipal incinerators, steam generators, etc. This indicates that, within the framework of the Clean Air Act as a whole, the federal government considers not only generators, incinerators and (presumably) engines, but also structures like plants, mills and (pre-

overlooked in the context of air pollution, where the focus of concern is pollutant entry into the ambient (outside) air rather than its mere entry into the internal atmosphere of the test cell.[10] Where, as part of the manufacturing process (hypothetical or real), engine exhausts mingle with and ultimately emanate along with other factory emissions, it would stretch Section 233 absurdly to say that states are preempted from requiring screens to be placed in the factory smoke stacks because to do so would be, at least in part, to regulate exhausts "from" engines. Yet, it is precisely this *type* of preemption which defendants urge here. Clearly, defendants overburden the word "from" by implying that, under Section 233, once emissions have *originated* in aircraft engines, the state may never touch these emissions, regardless of where they go or what happens to them thereafter.

■ The factory analogy serves to show that, more logically, the focus of Section 233 is preemption of state regulation of the *engine* and not preemption of state regulation of emissions once they have left the engine. The most sensible facial reading of Section 233 is that it focuses, preemptively, upon standards for aircraft engine emissions in a way which implies modification of the *engine* so as either to prevent *creation* of certain emissions (via internal alteration) or to prevent those emissions from *leaving* the engine (via external attachment of anti-pollution devices, etc.). State regulation of test cells here, however, focuses upon emissions *after* they have left the engine and, thus, *after* they have become part of the internal atmosphere of the stationary test cell. Thus, there is a true and highly practical distinction between emissions "from"

engines and emissions "from" test cells. Section 233 does not, on its face, extend to the latter.

The legislative history is also inconclusive as to direct interpretation of the Section 233 language. In one of the few statements concerning Section 233 during the 1970 Amendment debates, Congressman Staggers said that "[w]ith regard to aircraft the Federal Government would preempt the field". *A Legislative History of the Clear Air Act Amendments of 1970*, S.Comm. on Public Works, 93d Cong., 2d Sess., ser. 93–18, at 113 (1974). However, the question once again remains: What is the *scope* of this "field"? Similarly, House Report No. 91–1146; U.S.Code Cong. & Admin.News 1970, p. 5356 noted:

"No State may require certification, inspection, or any other approval relating to the control of emissions from any aircraft or engines as a condition precedent to the initial sale, titling, or registration of aircraft or engines." P.L. 91–604, U.S. Code Cong. & Ad.News (1970) at p. 5370.

If anything, this Congressional expression comports with the conclusion that the scope of Section 233 is highly focused upon regulation of the engines themselves and, therefore, does not extend to state regulation of test cells.[11]

In short, the Court finds on the face of Section 233 no clear or explicit preemption of state test cell regulation.

## C.

■ Thus, the next question is whether Congressional intent to preempt may be *inferred*. The traditional test for when and

---

sumably) test cells to be "sources" of pollution—entities "from" which pollution emanates.

**10.** The Clean Air Act repeatedly refers to pollution of the "ambient air", which is "the statute's term for the outdoor air used by the general public". *Train v. NRDC*, 421 U.S. 60, 65, 95 S.Ct. 1470, 1475, 43 L.Ed.2d 731 (1975).

**11.** In addition, Section 234 of the Clean Air Act refers to 49 U.S.C. § 1301 wherein:

"'Aircraft engine' means an engine used, or intended to be used, for propulsion of

aircraft and includes all parts, appurtenances, and accessories thereof other than propellers."

Although this definition is not *particularly* definitive, it clearly does *not* include test cells and does not in any way import that Section 233 preempts state test cell regulation. If anything, the reference to propulsion supports the view that federal concern is directed toward structure and performance of *engines* and not test cells.

how preemptive intent may be inferred or evidenced was formulated in *Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 230, 67 S.Ct. at 1152:

" * * * [W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. *Napier v. Atlantic Coast Line R. Co.,* 272 U.S. 605, 611 [47 S.Ct. 207, 209, 71 L.Ed. 432]; *Allen-Bradley Local v. Wisconsin Employment Board,* 315 U.S. 740, 749 [62 S.Ct. 820, 825, 86 L.Ed. 1154]. Such a purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. *Pennsylvania R. Co. v. Public Service Comm'n,* 250 U.S. 566, 569 [40 S.Ct. 36, 37, 63 L.Ed. 1142]; *Cloverleaf Butter Co. v. Patterson,* 315 U.S. 148 [62 S.Ct. 491, 86 L.Ed. 754]. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. *Hines v. Davidowitz,* 312 U.S. 52 [61 S.Ct. 399, 85 L.Ed. 581]. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same *purpose. Southern R. Co. v. Railroad Commission,* 236 U.S. 439 [35 S.Ct. 304, 59 L.Ed. 661]; *Charleston & W. C. R. Co. v.*

*Varnville Co.,* 237 U.S. 597 [35 S.Ct. 715, 59 L.Ed. 1137]; *New York Central R. Co. v. Winfield,* 244 U.S. 147 [37 S.Ct. 546, 61 L.Ed. 667]; *Napier v. Atlantic Coast Line R. Co., supra.* Or the state policy may produce a *result* inconsistent with the objective of the federal statute. *Hill v. Florida,* 325 U.S. 538 [65 S.Ct. 1373, 89 L.Ed. 1782]. It is often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory measures has left the police power of the States undisturbed except as the state and federal regulations collide. *Townsend v. Yeomans,* 301 U.S. 441 [57 S.Ct. 842, 81 L.Ed. 1210]; *Kelly v. Washington,* 302 U.S. 1 [58 S.Ct. 87, 82 L.Ed.2d 3]; *South Carolina Highway Dept. v. Barnwell Bros.,* 303 U.S. 177 [58 S.Ct. 510, 82 L.Ed. 734]; *Union Brokerage Co. v. Jensen,* 322 U.S. 202 [64 S.Ct. 967, 88 L.Ed. 1227]. (Emphasis added.)

Exclusionary or preemptive intent has been inferred in other situations as well, for instance, where the federal statute contemplates uniformity of standards (*Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961)), or where uniformity seems vital to national interests (*City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973)). As the *Rice* excerpt indicates, determination of preemptive intent may focus upon statutory purposes as well as upon statutory results or effects.[12]

---

**12.** Inference of preemption has often focused upon *actual* regulatory conflicts—the *effects* of federal and state regulation as opposed to more theoretical conflicts of *purpose.* For example, the Supreme Court in *Florida Avocado Growers v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), held:

" * * * [I]t is suggested that the coexistence of federal and state regulatory legislation should depend upon whether the *purposes* of the two laws are parallel or divergent. This Court has, on the one hand, sustained state statutes having objectives virtually identical to those of federal regulations, *California v. Zook,* 336 U.S. 725, 730–731 [69 S.Ct. 841, 843–844, 93 L.Ed. 1002]; cf. *De Veau v. Braisted,* 363 U.S. 144, 156–157 [80 S.Ct. 1146, 1152–1153, 4 L.Ed.2d 1109]; *Parker v. Brown,* 317 U.S. 341 [63 S.Ct. 307, 87 L.Ed. 315]; and has, on the other hand,

struck down state statutes where the respective purposes were quite dissimilar, *First Iowa Hydro-Electric Cooperative v. Federal Power Comm'n,* 328 U.S. 152 [66 S.Ct. 906, 90 L.Ed. 1143]. *The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives.*

The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained. See, e. g., *Huron Port-*

Before applying the *Rice* test, however, it is necessary to outline the Congressional purposes behind preemption of aircraft emissions under Section 233. In general, Congress felt that allowing the states to set fifty different standards for "moving sources" of pollution—sources readily crossing and recrossing state boundaries—"would harass industry and progress in America". *City of Burbank v. Lockheed Air Terminal, Inc., supra,* 411 U.S. at 637, 93 S.Ct. at 1861. More specifically, although Congressional purposes behind aircraft preemption have not been made particularly explicit, the purposes behind motor vehicle preemption *have* been delineated, and these expressions of intent apply equally to aircraft:

"The reasons given for the enactment of the pre-emption provision can be summarized as follows: to protect the manufacturer against having to build engines which would comply with a multiplicity of standards (Senator Muskie); to protect the vehicle owner from having to deal with different standards in each state in which he drives (Senator Muskie); to avoid the unnecessary duplication of federal standards (Undersecretary Coston); to avoid 'unnecessary expense' to the owner (the Senate Public Works Committee); and generally to avoid 'chaos' and 'confusion' (Thomas Mann, Undersecretary Coston, and the Senate Public Works Committee)." Currie, *Motor Vehicle Air*

*Pollution: State Authority and Federal Pre-emption,* 68 Mich.L.Rev. 1083, 1090 (1970).

Quite clearly then, Section 233 preemption is aimed at protecting the owner and the manufacturer of the *vehicle* and the *engine* against the "chaos" of multiplex standards for entities which readily traverse state lines. State regulation of test cells in the instant case, by contrast, in no way interferes with this Congressional purpose—since test cells are immobile, there is no multiplicity of standards problem, and modification of test cells in no way affects the structure or performance of aircraft engines. Although in terms of *Rice v. Santa Fe Elevator Corp., supra,* federal regulation is "pervasive" or "dominant" insofar as aircraft and aircraft engines are concerned, that dominance is not present with respect to test cells; there is no conflict, in either purpose or effect, between state regulation of test cells and federal interests in protecting the interstate or even potentially interstate aspects of aircraft engine utilization—those aspects relating to engine performance, design, manufacture, operation, etc. In terms of the "interstate commerce" purposes behind federal "moving source" preemption, there is simply no need or reason for uniform *test cell* emission standards—the plaintiffs are here seeking, simply, to modify or regulate stationary structures.[13]

---

land Cement Co. v. Detroit, supra* [362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852]." (Emphasis added.)

The *effect*-oriented test of *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) has also been widely followed. Preemption depends upon whether the state regulation "stands as an obstacle to the *accomplishment* and *execution* of the full purposes and objectives of Congress" (emphasis added).

Furthermore, in *Huron Cement Co. v. Detroit,* 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852, the Supreme Court explicitly viewed preemption in terms of an "actual conflict" standard:

"In determining whether state regulation has been preempted by federal action, 'the intent to supersede the exercise by the State of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit

to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the State.' *Savage v. Jones,* 225 U.S. 501, 533 [32 S.Ct. 715, 726, 56 L.Ed. 1182]. See also *Reid v. Colorado,* 187 U.S. 137 [23 S.Ct. 92, 47 L.Ed. 108]; *Asbell v. Kansas,* 209 U.S. 251 [28 S.Ct. 485, 52 L.Ed. 778]; *Welch Co. v. New Hampshire,* 306 U.S. 79 [59 S.Ct. 438, 83 L.Ed. 500]; *Maurer v. Hamilton,* 309 U.S. 598 [60 S.Ct. 726, 84 L.Ed. 969]."

As this Opinion demonstrates, state and federal regulations here conflict neither as to administration and effect nor as to underlying purpose.

**13.** The fact that Section 233 appears in Subchapter II of the Clean Air Act, entitled "Emission Standards for *Moving* Sources" (emphasis added), bolsters the Court's views concerning the "interstate" purpose and scope of the federal preemption involved here.

■ In short, there is a crucial difference in subject matter between what the state now seeks to regulate and the type of regulation which Congress sought to preempt. When viewed against the backdrop of federally reinforced, broad state powers to regulate air pollution generally (discussed more fully, *infra*), there appears no ground for broadening Section 233's rather well-defined (in terms of Congressional intent) aircraft and engine-oriented preemption to cover state regulation of test cells which is essentially unrelated to the purpose underlying that preemption.

Therefore, following the principles outlined in *Rice*, preemption (under Section 233) of state test cell regulation is manifestly unwarranted in this case.[14]

Furthermore, the courts have often found the opinions of involved federal agencies to be persuasive on the subject of preemption. *See, e. g., Farmers Educational & Co-op Union v. WDAY, Inc.*, 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959). In this regard, EPA Assistant Roger Strelow has indicated that Agency's position in a letter dated December 31, 1975:

"We agree with [Department of Defense's] view that the Clean Air Act does not authorize the EPA to regulate pollutant emissions from military aircraft and aircraft engines and that the Act preempts State and local regulation of aircraft and aircraft engine emissions. However, it must be recognized that the courts generally construe preemption provisions quite narrowly. They generally examine the challenged State or local measure carefully and, if it can be construed not to interfere with the protected

14. Defendants argue that the preemption standard most appropriate to the instant situation is stated elsewhere in *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 236, 67 S.Ct. 1146, 1155, 91 L.Ed. 1447 (1947):

"The test [of applicability of state laws] is whether the matter on which the State asserts the right to act is in any way regulated by the Federal Act. If it is, the federal scheme prevails though it is a more modest, less pervasive regulatory plan than that of the State."

First of all, however, this test appears to apply to matters concerning which Congress has *declared* its policy and, in this case, Congress has *not* declared a policy with respect to test cells. The Supreme Court in *Rice* went on to indicate that states are free to continue to regulate matters concerning which Congress has not declared or adopted a policy, in the absence of any conflict with those matters upon which the federal Act *has* spoken. Thus, since, as stated, there is no conflict between state regulation of test cells and federal regulation of aircraft and engines, plaintiffs should be free here to seek relief in the form of test cell modification. Moreover, even if the *Rice* "in any way regulated" test *did* apply here, the relief plaintiffs seek would not fall within this rule. Again, the state asserts the right to act on (the right to modify) *test cells* which do not seem to be "in any way regulated" by Section 233's preemption with respect to *aircraft* and *engines.*

It should also be noted that the Supreme Court *has*, on at least one occasion, found preemption where state regulation did no more than supplement federal law. *Campbell v. Hussey*, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961). However, in *Campbell* state and federal law operated upon the same product (type 14 tobacco), whereas here, as stated, federal preemption applies to engines and aircraft while state regulation applies to test cells.

As the preceding discussion illustrates, and as the Court fully recognizes, determinations of actual or theoretical conflict rest heavily upon the characterization given the *subject matter* of the regulations involved.

However, to proceed, as defendants do, on the rigid premise (itself based on the mechanistic argument that all test cell emissions are also, perforce, engine emissions) that engines and engine emissions constitute the subject matter of *both* state and federal regulations here is to cultivate a most absurd result (discussed in text, *supra*)—under defendants' premise, states would be precluded from in any way disposing of pollution particles in the atmosphere, on the ground, or wherever, simply because those particles at one time originated in aircraft engines.

In this light, in light of Congressional purposes and in light of the most sensible contextual reading of the language of Section 233, it again becomes clear that Section 233 is aimed primarily at preemption of state *aircraft* and *engine* regulation, and not at all at test cell regulation which purports to abate emissions *after* they have left the aircraft engines themselves. The Court, therefore, has little doubt that the most appropriate characterization of the regulatory subject matter involved here is engine/engine emissions (federal) on the one hand and test cells/test cell emissions (state) on the other. This characterization reflects the truth of the matter—there simply *is no* regulatory conflict in this case.

federal activity, uphold it. Accordingly, *we believe that a court reviewing a State regulation on visible emissions from jet engine test cells would examine the regulations to determine whether requirements to capture and control emissions emanating from the test cell necessarily constitute regulation of the aircraft engine being tested.* If the court were to find no necessary impairment of the operator's ability to operate and test the engine, it seems quite likely that it would find the State action not to contravene the Congressional purpose of barring varying State and local regulations which dictate how engines are designed, built and operated." (Emphasis added.)

Completing and applying Strelow's analysis, state modification of test cells here cannot be said to "necessarily regulate" the engines housed because, again, such modification has absolutely no effect upon design, manufacture, and/or operation of aircraft engines. In fact, the Court has stated its intention to limit relief here to modifications which in no way affect engine structure and/or performance; indeed, plaintiffs seek no relief beyond this limitation. Thus, under the EPA's own view of the law, there should be no preemption of state test cell regulation in this case.

Moreover, the Supreme Court has dealt with aircraft pollution preemption on prior occasions, most significantly in *City of Burbank v. Lockheed Air Terminal, Inc., supra.* There, in upholding federal preemption of the field of aircraft noise pollution, the Supreme Court wrote:

"As stated by Judge Dooling in *American Airlines v. Hempstead* [D.C.N.Y.] 272 F.Supp. 226, 230, *aff'd* [2 Cir.] 398 F.2d 369:

'The aircraft and its noise are indivisible; the noise of the aircraft extends outward from it with the same inseparability as its wings and tail assembly; to exclude the aircraft noise from the Town is to exclude the aircraft; to set a ground level decibel limit for the aircraft is directly to exclude it from the lower air that it cannot use without

exceeding the decibel limit.' " *City of Burbank v. Lockheed Air Terminal, Inc., supra,* 411 U.S. at 628, 93 S.Ct. at 1857.

This passage implies the "necessarily regulates" test described by EPA Assistant Strelow—the way in which Burbank sought to control noise pollution was preempted because it necessarily regulated aircraft operations and performance. Here, however, to modify the test cells is in no way to exclude, regulate, or affect the engines. If anything, *City of Burbank* confirms the Court's view that the scope of federal aircraft pollution preemption is limited to preemption of state regulations which touch upon (directly or indirectly) the engines—their design, manufacture, operation, etc. Again, such effect is entirely absent from plaintiffs' attempts to modify test cells here.

Defendants argue the following excerpt from *City of Burbank v. Lockheed Air Terminal, Inc., supra,* 411 U.S. at 638–639, 93 S.Ct. at 1862:

"Control of noise is of course deep-seated in the police power of the States. Yet the pervasive control vested in EPA and in FAA under the 1972 Act seems to us to leave no room for local curfews or other local control. What the ultimate remedy may be for aircraft noise which plagues many communities and tens of thousands of people is not known. The procedures under the 1972 Act are under way. In addition, the Administrator has imposed a variety of regulations relating to takeoff and landing procedures and runway preferences. The Federal Aviation Act requires a delicate balance between safety and efficiency, 49 U.S.C. § 1348(a), and the protection of persons on the ground. 49 U.S.C. § 1348(c). Any regulations adopted by the Administrator to control noise pollution must be consistent with the 'highest degree of safety.' 49 U.S.C. § 1431(d)(3). The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled."

This Court does not, of course, dispute the fact that Congress has clearly and pervasively preempted the field of aircraft emissions. Nevertheless, if anything, the above passage further bolsters the conclusion that such preemption, however clear within its sphere, does not extend to state test cell regulation which in no way affects engine performance and thus in no way interferes with the "delicate balance between safety and efficiency and the protection of persons on the ground".[15]

### D.

Clearly, the law of federal preemption is a sprawling subject (which, owing to the importance of the instant case, this Court has nevertheless felt compelled to canvass) —there is no single principle equally applicable to all situations. Thus, perhaps the most universal truth regarding this field is Justice Douglas' remark, in *City of Burbank v. Lockheed Air Terminal, Inc., supra,* 411 U.S. at 638, 93 S.Ct. at 1862, that:

"Our prior cases on pre-emption are not precise guidelines in the present controversy, for each case turns on the peculiarities and special features of the federal regulatory scheme in question."

It is precisely the nature of the regulatory scheme at issue in this case which provides the strongest reasons for not preempting state regulation of test cells here.

As noted at the outset, the scheme of the Act provides for broad state powers to implement air pollution standards generally; although Congress has specifically preempted portions of this state authority, particularly insofar as "moving sources" are concerned, it is quite clear that aside from these preemptions, state power retains its expansive base.[16] This broad authority has its origins in the common law and, again, has been fully incorporated into the Act. In 42 U.S.C. § 1857(a)(3), Congress declared:

"that the prevention and control of air pollution at its source is the primary responsibility of States and local governments * * *."

*See also, Washington v. General Motors Corp., supra,* 406 U.S. at 114, 92 S.Ct. 1396. This declaration is echoed in 42 U.S.C. § 1857c–2(a), and in 42 U.S.C. § 1857d–1, which provides that *except for* federal preemption with regard to *certain* state regu-

---

**15.** *Recent authority supports the notion that the scope of aircraft pollution preemption as espoused in* City of Burbank v. Lockheed Air Terminal, *411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), ought not be overbroadly construed. Thus, in a somewhat different context, this District has held:*

"The factual picture supporting *Burbank* is of narrow focus, a single police power ordinance of a municipality * * * intending to abate aircraft noise by *forbidding* aircraft flight at certain night hours. The holding in *Burbank* is limited to that proscription as constituting an unlawful exercise of police power in a field preempted by the federal government * * *." *Air Transport Ass'n of America v. Crotti,* 389 F.Supp. 58, 63 (N.D. Cal.1975).

In the instant case, state test cell regulation not only does not *forbid* aircraft flight but has absolutely no effect upon aircraft or engine performance. Thus, *City of Burbank* is clearly distinguishable.

Furthermore, prior to the enactment of federal preemptions with respect to moving sources of pollution, the Supreme Court upheld a local ordinance imposing smoke limitations on vessels engaged in interstate commerce:

"State regulation, based on the police power, which does not discriminate against inter-

state commerce or operate to disrupt its required uniformity, may constitutionally stand." *Huron Cement Co. v. City of Detroit,* 362 U.S. 440, 448, 80 S.Ct. 813, 818, 4 L.Ed.2d 852 (1960).

Thus, as has been noted, were it not for statutory enactment of preemption provisions in 1967 and 1970, the *Huron* decision would provide strong authority for upholding state regulation of vehicle emissions. Currie, D. P., *Motor Vehicle Air Pollution: State Authority and Federal Pre-emption,* 68 Mich.L.Rev. 1083, 1088 (1970). However, since *Huron* was based upon the notion that air pollution control within state borders is primarily a *state* responsibility, a notion now statutorily enacted in 42 U.S.C. § 1857(a)(3), that decision is still good authority for refusing to *extend the scope of* federal preemption to cover state regulation of test cells here—again, such regulation in no way disrupts or affects federal preemptive interests in uniformity and interstate commerce.

**16.** For exhaustive treatment of the structure of the Clean Air Act, *see Train v. NRDC,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975) and *Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976).

lation of moving sources, states retain broad residual authority. *See also, Washington v. General Motors Corp., supra,* 406 U.S. at 115 n.4, 92 S.Ct. 1396. Subchapter I of the Act is replete with evidence that this state authority extends well beyond "stationary sources". *See* note 3, *supra.* In fact, although they may be large chunks, federal preemptions with respect to moving sources are, in terms of the Act scheme, still chunks carved *out of* the basic monolith of state authority. This Court also finds "in the structure of the Act an intent on the part of Congress that state policies in this area should operate vigorously". *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 140, 94 S.Ct. 383, 396, 38 L.Ed.2d 348 (1973). In fact, Congress has so reinforced state pollution control power under the Act, that federal facilities and installations have been subjected to state standards "to the same extent [as] any person". § 118, 42 U.S.C. § 1857f. *Hancock v. Train, supra.* A primary motivation behind the 1970 Amendments to the Act was a need to "strengthen the strictures against air pollution by federal facilities" (*Hancock v. Train, supra,* 426 U.S. at 171, 96 S.Ct. at 2009), which had been remarkably laggard in abating pollution and which had not accorded pollution control a sufficiently high priority. P.L. 91–604, U.S.Code Cong. & Ad.News (1970) at p. 5360. In addition, under the Act, state implementation standards are, after EPA acceptance, promulgated as *federal* regulations. (The California Implementation Plan standards involved here have been so promulgated. 37 Fed.Reg. § 19812; 40 C.F.R. § 52.220.) Thus, since the state standards involved in this case are essentially *federal* as well as state and local regulations, Supremacy Clause considerations and, therefore, any presumptions favoring extension of preemptive scope are decidedly weakened. *See, e. g., Appalachian Power Co. v. EPA,* 477 F.2d 495, 499 (4th Cir. 1973); *Duquesne Light Co. v. EPA,* 522 F.2d 1186, 1189 (3d Cir. 1975).

In the bare constitutional setting—where state power is wrought from constitutional implications alone—the weight of the Supremacy Clause *might* be said to create certain presumptions favoring extensions or broad readings of preemptive scope. However, the preceding discussion has indicated that *even in that setting,* the Section 233 preemption should not be construed as covering state regulation of tests cells, primarily because the state and federal regulations involved in this case do not conflict with or affect one another insofar as either underlying purpose or practical effect are concerned.

Moreover, in terms of Justice Douglas' comment in *City of Burbank v. Lockheed Air Terminal, Inc., supra,* the "peculiarities and special features" of the regulatory framework of the Act clearly *disfavor* the broad reading of Section 233 which defendants here urge. Not only is state constitutional authority greatly strengthened under the Act (via incorporation into the Act, reinforcement in terms of federal acknowledgments of residual power, "federalization" of implementation plans, etc.), but federal constitutional (Supremacy Clause) power to withstand that state authority is also diminished (via heightened responsibility under Section 118). Although the Supremacy Clause might still be quite operative in this context, the counterweights of federal responsibility and federally underscored state power call for extreme judicial reluctance concerning extensions of the preemptive scope of Section 233 to the circumstances of state test cell modification.

In short, defendants urge, as the basis for their motion, a broad reading of Section 233 which appears entirely inconsistent with the scheme of the Act. At oral argument, despite repeated inquiries by this Court, defendants proffered no federal interest, federal purpose, or federal result that would be interfered with or prejudiced by state test cell modification. Indeed, there seems to be *no* such conflict or even slightly uncomfortable overlap between the purposes, effects and administration of Section 233 and the relief sought by plaintiffs in this lawsuit. Thus, the Court now holds that Section 233 does not preempt this litigation and that, therefore, the federal responsibilities which

are so clearly envisioned by Section 118 of the Act may no longer be dodged.[17]

## VII.

Next, defendants contend, somewhat paradoxically, that this suit is barred under Section 111 of the Act, 42 U.S.C. § 1857c–6, because, first, the EPA has not, pursuant to that section, defined test cells as "stationary sources" and, second, test cells are "new sources" not subject to state control.

The obvious preliminary question is whether Section 111 applies to this case, and the Court agrees with plaintiffs that it does not. Section 111 directs the EPA Administrator to publish a list of categories of stationary sources which "contribute significantly to air pollution which causes or contributes to the endangerment of public health or welfare", and to thereafter promulgate pollution standards for "new

**17.** Defendants proffer the additional argument that this suit is "preempted" by the Plenary Powers (Art. I, § 8, cl. 17) and War Powers (Art. I, § 8, cls. 11, 13, 15) Clauses of the United States Constitution. With respect to the Plenary Powers claim, defendants cite the following passage from *Paul v. United States,* 371 U.S. 245, 263, 83 S.Ct. 426, 437, 9 L.Ed.2d 292 (1963):

"The cases make clear that the grant of 'exclusive' legislative power to Congress over enclaves that meet the requirements of Art. I, § 8, cl. 17, by its own weight, bars state regulation without specific congressional action."

However, in this case, Sections 118 and 304 of the Clean Air Act do constitute such "specific congressional action" subjecting "*each* department, agency and instrumentality of the executive, legislative and judicial branches of the Federal Government", 42 U.S.C. § 1857f (emphasis added), to the pollution standards which plaintiffs seek to enforce here. Indeed, the Supreme Court in *Hancock v. Train,* 426 U.S. 167, 182, 96 S.Ct. 2006, 2014, 48 L.Ed.2d 555 (1976), specifically considered both the Supremacy and Plenary Power Clauses before ruling:

"* * * that § 118 obligates existing federal installations to join nonfederal sources in abating air pollution, that comparable federal and nonfederal sources are expected to achieve the same levels of performance in abating air pollution, and that these levels of performance are [not only] set by the States * * *."

but are also enforceable by the States under Section 304.

With regard to the War Powers argument, it is clear that this Clause has justified broad, affirmative *federal actions necessitated by or as a* result of national military interests. *See, e. g.,* *Woods v. Miller Co.,* 333 U.S. 138, 68 S.Ct. 421, 92 L.Ed. 596 (1948); *Hirabayashi v. United States,* 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). However, defendants cite no case wherein the War Powers Clause has served the defensive purpose of immunizing a military department from civil suit, *over and above* the scope of immunity bestowed by the Supremacy and Plenary Powers Clauses in general. While

this Court can conceive of situations in which the War Powers Clause might properly be put to such use, defendants here have made no showing of the type of specific emergency or necessity which might invoke such a concept. Again, the language of Sections 118 and 304 of the Clean Air Act is quite clear and the presumption must be that reference to *all* federal departments, agencies, and instrumentalities includes the Department of the Navy. Defendants have cited no authority for the proposition that, in this situation, the War Powers Clause exempts the Navy from compliance with the Act although nonmilitary facilities are clearly not so exempt. In this regard, it must be mentioned that Section 118, 42 U.S.C. § 1857f, specifically provides:

"The President may exempt any emission source of any department, agency, or instrumentality in the executive branch from compliance with [federal, state, interstate and/or local pollution abatement requirements] if he determines it to be in the paramount interest of the United States to do so * * *."

The existence of such exemptive power strongly implies that no implicit exemptions from Sections 118 and 304 were intended and that any exemptions are to be bestowed by the executive rather than the judicial branch. No executive exemption has thus far been granted the Navy.

Furthermore, it must again be noted that the Clean Air Act is *federal* legislation, a fact which would, in any case, take much, if not all, *of the sting out of defendants'* Supremacy, Plenary Powers, and War Powers arguments. Finally, it also bears repeating that there appears to have been little doubt about the United States Army's basic amenability to suit under Section 304 in *Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976). Although the War Powers Clause was not specifically mentioned in *Hancock,* the Supreme Court would certainly have raised it had it been a bar to suit.

Therefore, the Court finds defendants' contentions regarding the Plenary Powers and War Powers Clauses to be without merit here.

sources"[18] within such categories. States *may* (unlike Section 110(a)(1), Section 111(c)(1) is permissive) develop implementation plan standards and procedures for these "new sources" and:

"If the Administrator finds the State procedure is adequate, he shall delegate to such State any authority he has under this chapter to implement and enforce such standards (except with respect to new sources owned or operated by the United States)." § 111(c)(1), 42 U.S.C. § 1857c–6(c)(1).

Thus, the Section 111 scheme places primary responsibility for "new stationary source" pollution abatement upon the EPA, yet provides for delegation to the states of all such responsibility, *excluding* that directed at federally owned or operated sources.

 The Congressional purpose behind Section 111 was to nip *significant* new air pollution problems in the bud; *federal* standards were thought necessary to at least in part:

"* * * preclude efforts on the part of States to compete with each other in trying to attract new plants and facilities without assuring adequate control of extra-hazardous or large-scale emissions therefrom." P.L. 91–604, U.S.Code Cong. & Ad.News (1970) at p. 5358.

Since new source performance standards were intended to be stricter than Section 110 standards, Section 111 applies only to sources constructed or modified after the effective date of the standard and does not contemplate retrofitting of preexisting facilities. In addition, because new source performance standards were devised by the Act as an overlay upon Section 110 standards, they are not intended to be inclusive of all sources, but are aimed instead at especially problematical sources. *See, e. g.,* P.L. 91–604, U.S.Code Cong. & Ad.News (1970) at pp. 5358, 5361. In general, then, the EPA's powers under Section 111 do not

preempt state authority to regulate preexisting sources under Section 110.

 Thus, the fact that the EPA has not included test cells in its list of "stationary sources" under Section 111 does not preclude state regulation of test cells under Section 110 for two reasons. First, since Section 111 is limited to *particular* new source problems, test cells can still be "stationary sources" even though not listed as such in 40 C.F.R. § 60 (where the Section 111 list is promulgated)—only *some* stationary sources have been published as such under Section 111. Second, as stated above, since the states' power under Section 110 is general, preexisting test cells may be regulated thereunder, absent specific preemption, whether they are labeled "stationary sources" or not.

In addition, test cells are not "new sources" within the meaning of Section 111 precisely *because* they are not on the 40 C.F.R. § 60 list—no new source performance standards have been promulgated with respect to test cells. Clearly then, there *are* at this time *no* test cell new sources because, by definition, new sources are those constructed or modified *after* the adoption of pertinent new source standards. Note also that even were the EPA to promulgate test cell "new source" standards the day this opinion is filed, the test cells involved in this case would still be regulable under Section 110 and not under Section 111 because their construction would be viewed as antedating the adoption of any such standard. In this sense, the Section 111(c)(1) preemption with respect to "new sources owned and operated by the United States" would apply to test cells erected or modified thereafter, but would not apply to the preexisting test cells which are the subject of this lawsuit. In short, state Section 110 regulation of the test cells involved here is not now, nor can it ever be (absent modification of these cells *subsequent to* some

---

**18.** Under Section 111(a)(2), 42 U.S.C. § 1857c–6(a)(2):

"The term 'new source' means any stationary source, the construction or modification of which is commenced after the publication

of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source."

hypothetical promulgation of test cell "new source" standards), preempted by federal regulation under Section 111.

## VIII.

Defendants contend that the visible emission standards upon which plaintiffs' claims of violation are based are, first, *invalid* and, therefore, unenforceable as applied to test cells and, second, *inappropriate* for measurement of pollution from aircraft engines as they are being tested in the cells.

Regarding *invalidity* defendants argue that plaintiffs' utilization of an *opacity* standard to measure violations in this case contravenes the EPA's establishment of separate standards for aircraft and aircraft engines with respect to which a *smoke sampling* method is specified. 40 C.F.R. § 87. However, this argument harks back to and is essentially controlled by the preemption issue—since the smoke sampling method set forth in 40 C.F.R. § 87 was developed pursuant to the EPA's rule-making power under Sections 231 and 232 of the Act, the scope of this method's application is entirely coextensive with the scope of the Section 233 preemption. In other words, since the smoke sampling method pertains to emissions from aircraft and aircraft engines, plaintiffs are not bound to utilize this method for measurement of test cell emissions because, as this Court has held, the Section 233 preemption does not extend to test cell pollution.

With respect to the standard which plaintiff *does* utilize here—the opacity method—there is no basis for ruling this standard invalid as a matter of law. In fact, it has been judicially recognized that opacity standards are *not* too unreliable for use as measures of pollution from sources sufficiently similar to test cells. *Portland Cement Association v. Train,* 168 U.S.App.D.C. 248, 513 F.2d 506 (1975).[19]

Regarding *inappropriateness,* defendants contend that the Ringelmann standard (*i. e.,* the precise opacity standard utilized by plaintiffs in this case) has been widely criticized by the scientific community, is subjective and inaccurate and has been rejected by the EPA for the purposes of measuring aircraft engine emissions. In support of their argument, defendants excerpt the following passage from the EPA regulations:

"Several commenters recommended that the Ringelmann visual system for evaluating aircraft gas turbine smoke behavior should be substituted for the indirect filtration system described in the regulations, to facilitate direct correlation of the method used to certify engines with a technique which could be employed for enforcement purposes. Unfortunately, the Ringelmann system is not suited to the precise evaluation of engine smoking characteristics. Moreover, during test cell operation, the plume cannot be viewed directly and its appearance is not the same as it would be under the conditions of altitude and visual contrast which exist in flight. Therefore the prescribed filter reflectance method and associated sampling systems have been retained." 38 Fed.Reg. 19089 (July 17, 1973).

Defendants strenuously contend that the EPA's reference to measurement "during test cell operation" confirms the inappropriateness of Ringelmann with respect to both engine *and* test cell emissions. The opposite is clearly the case, however, and defendants' arguments constitute yet one more attempt to resurrect the preemption issue under a different flag. Thus, the above EPA comment regarding rejection of Ringelmann is directed toward federal *certification* of aircraft engines for Section 231 purposes and *not* toward state *field enforcement* of test cell standards under Section 110. In fact, the comment not only clearly distinguishes between certification standards and enforcement standards, but also reflects the appropriateness of Ringelmann use for enforcement purposes. The recognition that engine certification apparently

---

**19.** It should be noted that emissions from the test cells involved in this lawsuit may be viewed exactly the same way as emissions from the smoke stacks of most stationary sources.

occurs "during test cell operation" of engines does not change the fact that standards for engine certification promulgated pursuant to Section 231 and standards for test cell enforcement promulgated pursuant to Section 110 are aimed at regulation of different subjects and promotion of different purposes. As has been stated, Section 231 engine certification seeks to regulate the *engine* in such manner as to ensure that pollution abatement is consistent with federal interests in engine performance, operation, and design. State enforcement under Section 110, on the other hand, seeks to regulate the *test cell only*—since the engine is unaffected, federal interests in engine performance need not enter the balance whereby appropriate standards are determined. Clearly then, the rejection of Ringelmann by the EPA for engine certification purposes has little or no bearing on its use as an adequate state enforcement tool.

Aside from the EPA's implied acceptance, in the above regulatory excerpt, of Ringelmann use for enforcement purposes, further acceptance of the opacity standard involved in this case is inferable from the EPA's approval of the California Implementation Plan. This approval is entitled to a presumption of regularity. *Duquesne Light Co. v. EPA, supra.*[20]

█ Thus, the opacity standard utilized here cannot be held either invalid or inappropriate as a matter of law. Again, since the Court views this action as a non-preempted state enforcement suit, this opacity standard validly and appropriately applies to test cells.[21]

### IX.

█ In this litigation, plaintiffs seek equitable relief as well as civil penalties in the

amount of $500 per day. Defendants now move to dismiss the claim for civil penalties, and the Court agrees that the Act does not create a right in a state or any other party to assess such penalties against the United States, its officers, or agencies. Although the Act clearly imposes pollution abatement obligations on federal officers and agencies (§ 118, 42 U.S.C.A. § 1857f), the statutory remedy is framed in terms of suits for *enforcement* of these obligations. § 304, 42 U.S.C. § 1857h–2(a). In addition, Section 304(e), 42 U.S.C. § 1857h–2(e), provides:

> "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)."

Thus, the Act envisions, without itself specifically authorizing other remedial actions where such are grounded in statute or common law. In this regard, however, it is well established that in the absence of *specific* statutory provision for penalties the federal government may not be held liable for damages "which do not merely compensate but punish". *Missouri Pacific R. R. Co. v. Ault,* 256 U.S. 554, 564, 41 S.Ct. 593, 597, 65 L.Ed. 1087 (1921). As stated, civil penalties are *not* specifically authorized by the Act. Furthermore, this District has recently dismissed a claim against the Navy for penalties under 33 U.S.C. § 1161(*o*)(2) of the Federal Water Pollution Control Act, the companion section to 42 U.S.C. § 1857h–2(e) of the Act. *California v. Navy,* 371 F.Supp. 82 (N.D.Cal.1973). The court in *California v. Navy* (a situation quite analogous to the instant one) relied on *Ault* in denying assessment against the federal government of civil penalties authorized by state statute. Plaintiffs' sole argument against this result

---

**20.** As plaintiffs point out, Section 307(b)(2) of the Clean Air Act, 42 U.S.C. § 1857h–5(b)(2), forecloses defendants from challenging in this litigation the appropriateness of the EPA's general approval of the opacity standards contained in the California Implementation Plan.

**21.** Defendants also claim that plaintiffs have failed to record all observations of violations on

visible emission record forms as allegedly required by state and federal regulations. However, defendants have produced no evidence that failure to keep such records requires dismissal of this suit. Furthermore, it is clear that such records *were* kept for at least some of the violations alleged in this lawsuit.

is that *Ault* is an old case, decided before the advent of the Act and the age of governmental accountability. Although *ad hominem* arguments do, at times, have their appeal, this Court is obliged to apply the clear import of existing law.

Therefore, based on *Ault* and *California v. Navy,* plaintiffs' claim for civil penalties must be dismissed.

Defendants further contend that plaintiffs' claim for equitable relief is subject to dismissal because an injunction against the operations of the Navy cannot be justified in this case. Clearly, when, in the equity context, the extent of pollution alleged in this case is compared to the importance of the mission of the United States Navy, it is extremely unlikely that this Court would grant injunctive relief which in any way hinders or interferes with the Navy's operation and utilization of aircraft or aircraft engines. Indeed, such relief is probably foreclosed by the Section 233 preemption anyway. However, neither Section 233 nor equity principles would preclude an affirmative order directed at alteration of the *test cell* structure to ensure compliance with state implementation standards. Further specification of the contours of such an order must, of course, await further proceedings. Nevertheless, since such relief appears quite feasible, defendants' motion to dismiss plaintiffs' claim for equitable relief must be denied.

## X.

◼ Finally, defendants contend that the test cell pollution involved in this case is insignificant, does not endanger public health or welfare, and does not cause irreparable harm to the People of California. Clearly, however, pollution which violates standards approved by the EPA pursuant to its authority under the Act is, by definition, presumptively significant and irreparably harmful to health and welfare.[22] Moreover, even *assuming* that defendants' contentions might ultimately provide defenses to this litigation, these contentions are now hotly contested and, as such, go to the merits of the case as well as to the task of fashioning proper relief—they do not render this action currently vulnerable to a motion to dismiss.

Most importantly, in the Act, as in most statutes, there is no exemption for "insignificant" violations; the law does not set approximate standards. If the pollution in this case is comparatively small, it should be that much easier to clean up. It is the cumulative effect of innumerable "insignificant" pollutions which has hung an environmental cloud over our planet. In response, Congress has determined that the only meaningful way to improve air quality is to control each and every source of pollution via standards *uniformly* applicable within a given air basin.

In conclusion, most of the instant motions to dismiss have as their premise the notion that, somehow, defendants are entitled to a form of special treatment because the government is involved, because a military department is involved, because emissions which enter the ambient air directly from immobile test cell structures nevertheless have their chemical origin in aircraft engines, because *these* particular emissions should be dubbed "insignificant", etc. However, the Act Amendments of 1970, in subjecting all federal facilities to the same standards as the state, the city, the corporation, and the citizen, consciously and meticulously repudiated those notions of special treatment which had allowed governmental agencies to lag far behind in the common fight for clean air. The unmistakeable spirit of the Act now affirms the fact that pollution is an individual *and* a local *and* a national affair—as everyone has contributed to the problem, *everyone* must participate in the solution.

## ORDER

In accordance with the foregoing Opinion, defendants' motions to dismiss are hereby denied, except that defendants' mo-

---

**22.** *See, e. g.,* the definitions of primary and secondary ambient air quality standards contained in Section 109(b) of the Clean Air Act, 42 U.S.C. § 1857c–4(b).

tion to dismiss plaintiffs' claim for civil penalties is hereby granted.